1    **UNITED STATES DISTRICT COURT**

2    **SOUTHERN DISTRICT OF NEW YORK**

3

4    Gang Chen ,                                    Case No. 1:20-cv-09232MKV-SDA

5    Plaintiff

6    vs.                                            SECOND AMENDED COMPLAINT

7    China Green Agriculture, Inc.,                 ALLEGING SECURITIES FRAUD

8    Zhuoyu Li, Yongcheng Yang,

9    Daqing Zhu, Yiru Shi

10   Kabani & Company, Inc, KSP Group, Inc.

11   American Corporate Learning Center

12   Abdul Hamid Kabani,  Shahnaz Kabani            JURY TRIAL DEMANDED

13   Jaslyn Huynh Aka Jaslyn Sellers,

14   Defendants

15                            **NATURE OF ACTION**

16   Plaintiff, Gang Chen, in the above styled cause, sue defendants: China Green Agriculture, Inc.

17   ("CGA"), Zhuoyu Li("Li"),Yongcheng Yang("Yang"). DaqingZhu("Zhu"), Yiru Shi ("Shi"),

18   Kabani & Company, Inc. ("K&C"),  , KSP Group, Inc. ("KSP"), American Corporate Learning

19   Center ('ACLC'), Abudul Hamid kabani("Kabani"), Shahnaz Kabani ("Shahnaz") and Jaslyn

20   Sellers("Sellers"). This action is filed under Sections 10 (b), 20(a) of the Securities Exchange Act of

21   1934 (the "Exchange Act") and Rule 10b-5 there under 17 CFR 240.10b-5 against defendants for

22   security fraud by  making  fraudulent statements and employing manipulative and a deceptive

23   scheme, for the period between fiscal year 2016 (July 2015-June 30, 2016) and fiscal year 2020

24   ((July 2019-June 30, 2020), which has caused Plaintiff's realized loss of approximate $1.25million.

1

1

## JURISDICTION AND VENUE

This Court has subject-matter jurisdiction and personal jurisdiction over this action pursuant to 27

of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78aa).

The venue is proper in the district:

1. by the Order of District Court of Southern Florida,  transferred to the United States District

Court for the Southern District of New York pursuant to 28 U.S.C. §1404(a).

2. The district has personal jurisdiction on all the defendants. Pursuant to Section 27 of the Ex-

change Act, 28 U.S.C. § 1332 . CGA stock trades on the New York Stock Exchange NYSE there-

fore, Substantial activity performed and financial statement including audit report transmitted and

reached in the district.

3.Defendant causes false or misleading statements be transmitted into a judicial district, even if

some defendants never have been physically present in that district. Even some individual defend-

ants reside outside the United States, they do have much more than "minimum contacts" in US,

they are Chairman of the Board, Director(Chairman), Corporate Executive Officer(CEO), Chief

Financial Officer(CFO), President, and Directors of the Board, (Director) at highest position of

CGA. The fraudulent statements were prepared, reviewed, certified and signed by them and were

**continuously and systematically** disseminated, filed and reached in the United State, especially

this district and caused damages to public  investors in the United States.

4. In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants,

directly or indirectly, used the means and instrumentalities of interstate commerce, including but

not limited to, the United States mail, interstate telephone communications and the facilities of the

national securities exchange.

## PARTIES

1    Plaintiff Gang Chen, a retired Florida citizen and a private investor. Plaintiff has been investing

2    CGA stock online from home between fiscal year 2016 and June 2020. Plaintiff invested CGA

3    common stock relied solely upon Defendants' periodic fraudulent financial statements certified by

4    auditor defendants and other statements decimated publicly by press releases, conferences and filed

5    with SEC for deciding purchasing and holding the stock. While he had purchased and sold shares of

6    CGA stock at various times, he had continuously held the shares of CGA throughout that period. He

7    has realized net loss approximately $1.25 million as a result of defendants' violations of the federal

8    securities laws alleged herein

9    Defendant CGA is a public company, incorporated in Nevada, operated in China and listed on the

10   New York Stock Exchange.  CGA is engaged in research, development, manufacture and distribu-

11   tion of fertilizers and Agriculture products mainly through its wholly-owned Chinese subsidiaries:

12   Jinong Shaanxi TechTeam Jinong Humic Acid Product Co., Ltd. ("Jinong"), and Beijing Gufeng

13   Chemical Products Co., Ltd., ("Gufeng") and Yuxing Agriculture Technology Development Co.,

14   Ltd. ("Yuxing").

15   Defendant Zhuoyu Li ("Li") is CEO and Chairman since December, 2017, President since May 11,

16   (19) 2016;

17   Defendant Yang is Chief Financial officer since 2017 and Vice President of Finance since 2016,

18   Chief Financial Officer of Gufeng between 2010 and 2016;

19   Defendant Daqing Zhu is Director and Lead Independent Director, Chairman of Audit Committee

20   of the Board Since April 15, 2017;

21   Defendant Yiru Shi ("Shi") is .Director between December 18, 2011 and April 18, 2017,  Board's

22   Lead independent director 2015 to April 18, 2017, Chairman of Audit Committee, 2012 to April 18,

23   2017;

24   Defendants Li, Yang, Zhu and Shi are collectively referred to hereinafter "Officer and Director De-

25   fendants."

3

26   Defendant K&C, CGA's independent auditor between  January 2008 and April 19, 2017;

1   Defendant KSP is was CGA's auditor between April 20, 2017 and February 2020. It is controlled

2   by ACLC, Kabani and  Shahnaz;

3   Defendant ACLC is  A shell company created by Kabani and Shahnaz to be used as a vehicle for

4   controlling and managing KSP audit business and financial transaction and conceal the identity of

5   Kabani so that CGA and Kabani still continue their fraud scheme together;

6   Defendant Kabani is the owner of K&C and also the actual controller of KSP though ACLC and

7   Shahnaz;

8   Defendant Seller was Audit Director of KSP. But controlled by Kabani through ACLC and

9   Shahnas;

10  Defendant Shahnas is Kabani's wife and registered agent of ACLC and jointly with Kabani together

11  controlled KSP and Seller.

12  Defendants K&C, KSP, ACLC, Kabani, Shahnaz and Sellers are collectively referred to hereafter

13  "auditor Defendants"

14

15  **ALLEGATIONS TO CGA AND OFFICER/DIRECTOR DEFENDANTS**

16

17  **BACKGROUND OF CGA**

18  China Green was originally incorporated under the laws of Kansas on February 6,

19  1987 and had no operations from December 1996 through December 2007. In October 2007, it

20  reincorporated in the State of Nevada On December 26, 2007 the Company acquired all of the is-

21  sued and outstanding stock of Green New Jersey, a company which had been incorporated in New

22  Jersey in 2007. On August 24, 2007, Green New Jersey had acquired 100% of the outstanding

23  shares of Jinong, which was incorporated in the PRC on June 19, 2000. On January 19, 2007, .

24  The Company officially changed its name to China Green Agriculture, Inc. on February 5, 2008,

25  and was listed on the NYSE Amex Equities exchange on March 9, 2009 under the symbol "CGA."

26  On December 4, 2009, the Company voluntarily ceased trading on the NYSE Amex Equities ex-

1   change, and transferred to the NYSE on December 7, 2009, still under the symbol "CGA.". CGA

2   completed the Offerings in July 2009 and November/December 2009, reaping aggregate total pro-

3   ceeds of approximately $50,000,000. On July 2, 2010, the Company acquired Gufeng, a Beijing-

4   based fertilizer producer. By acquiring Gufeng and its wholly-owned subsidiary Tianjuyuan, the

5   Company's total annual production capacity purportedly increased from 55,000 to 355,000 metric

6   tons.

7   CGA has a long history of Fraud. As early as Oct 2010, only 10 months later from starting its

8   stock at NYSE, CGA was sued in a major class action. CGA was accused for engaging fraudulent

9   financial statement scheme under Securities Act 1933 and Exchange Act 1934, in connection with

10   its stock offerings and trading in NYSE. The accusations were mainly concentrated on falsified

11   data of value added tax (VAT), corporate income tax (CIT) and purchase prices paid for Gufeng

12   and Yuxing acquisitions in financial statement (certified by K&C and Kabani) and other docu-

13   ments filed with Security Exchange Committee ("SEC"). One fact the action based on "Despite

14   the Company's claims in audited financial statements that it made Corporate Income Tax(CIT)

15   payments to the State Administration of Taxation (SAT), the SAT has no documentation of such

16   payments ever even being made;" *Elliott v. China Green Agriculture, Inc*. 3:10-cv-00648-LRH –

17   RAM, Document 47, at 52. The litigation lasted 4 years, the District Court Judge denied defend-

18   ants' motion to dismiss. The cased ended August 2014 with a settlement proceeds of $2.5 million.

19   CGA earned more than 90% of its purported revenues from manufactures and sales of fertilizers,

20   and less than 10% from agricultural related products in China. However, in recent years, because

21   the supply significantly exceeds demand in Chinese fertilizer market plus tightened government

22   environmental control, CGA hardly make any money except loss by normal manufacturing and

23   sales operation. As a result, its main subsidiary,  Gufeng, were basically in an idle status.

24   Threrefore, CGA more and more relied on another main source to make money: defrauding Amer-

25   ican investors on US stock market.

1    Based on CGA' financial statement, among three major subsidiaries, Gufeng is a main contributor

2    of sales and income to CGA. According to last 3 years CGA annual reports (10-k): in 2017, the

3    whole company net sales total: $285,213,040, Gufeng sales $104,446,239, account 37%; 2018 net

4    sales total: $287,053,530, Gufeng sales $112,983,573, account 39%; 2019, net sales total:

5    $294,320,803, Gufeng $136,285,236, account 46%. So, on average Gufeng's contribution to total

6    sales is 41%. As for the income, 2017 the whole company operation income $31,977,771, Gufeng

7    $8,286,761, account 26%; 2018 total operation income: $29,801,787, Gufeng $10,151,272, account

8    34%; In 2019, total operation income: $18,804,748, Gufeng $14,076,655 account 74%. Therefore,

9    on average, Gufeng's contribution to company's total income is 45%. Therefore, Gufeng's financial

10   data is very significant: if Gufeng's data is fraudulent, a logical reasoning would be that the whole

11   financial reports are fraudulent. Therefore, Plaintiff concentrates most investigation on Gufeng.

12   Gufeng is also Plaintiff's main focus in the complaint. .

13   CGA ceased investor relation activities in 2018 and, as of May 2020, has not held any earning call

14   for 10 quarters.

15

16                                 **CGA'S STATEMENTS ARE**

17                       **MATERIALLY FRAUDULENT AND MISLEADING**

18   Throughout the relevant period, CGA issued and filed with SEC various press releases, financial

19   reports and other statements. Although almost all their statements are fraudulent, this complaint will

20   mainly focus on five allegations against CGA and Officer/Director Defendants. The five conclusory

21   allegations are related to the content in the annual report(10-k) and quarterly report (10-q): 1) reve-

22   nues 2) inventories, 3) VAT and CIT, 4) cash and cash equivalent on hand, 5) one current report (8-

23   k). The allegations are  based on the material facts compared with all their statements (inclusive but

24   not limited) though out the period between Fiscal years 2016 and 2020. Plaintiff will list sufficient

25   particularities related to selected reports to plausibly implicate why all the CGA's 4 annual reports

1     (10-K) and 15 quarterly reports(10-Q) and other statement filed during the relevant period are mate-

2     rially fraudulent and misleading.

3

4                      **ALLEGATION 1: GUFENG'S REVENUES ARE**

5                        **MATERIALLY FALSE AND MISLEADING**

6

7     **A. DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

8     On Oct 3, 2016, CGA issued a press release discussing its financial results for the fiscal year 2016

9     ended Jun 30, 2016. Stated:

10                 **"Fiscal Year 2016 Results of Operations**
11                 *Net Sales*
12                 ***Total net sales for the fiscal year ended June 30, 2016 were $268.8 million***, an in-
13                 crease of $5.4 million or 2.1%, from $263.3 million for the fiscal year ended June
14                 30, 2015. ***This increase was primarily due to an increase in Gufeng's and***
15                 ***Yuxing's net sales***.
16                 For the fiscal year ended June 30, 2016, Jinong's net sales decreased $4.6 million,
17                 or 3.6%, to $125.7 million from $130.4 million for the fiscal year ended June 30,
18                 2015. This decrease was mainly attributable to the decrease in Jinong's sales vol-
19                 ume, which was result of Jinong's implementation of its new sales strategy that fo-
20                 cuses on producing high-margin liquid fertilizer during the last fiscal year.
21                 ***For the fiscal year ended June 30, 2016, Gufeng's net sales were $134.7 million***,
22                 an increase of $6 million, or 4.7% from $128.7 million for the fiscal year end-
23                 ed June 30, 2015. The increase was mainly attributable to Gufeng's expansion of its
24                 marketing promotion strategy during the last fiscal year."
25         In the press release, quoted a coment from Defendant Li comment:
26                 "As we concluded our recent fiscal year, we are looking forward to
27                 the new fiscal year"
28     and a comment from  his Father , Mr. Tao Li, the Chairman and CEO of the Company,.

29                 " Looking ahead to the Fiscal Year 2017, we expect to reach revenue of $277
30                 to $300 million"

31     On October 3, Same day, CGA also held a earnings Conference call. Defendant Li did not show
32     up. CEO Tao Li  and CFO Assistant Fang Wang hosted the conference call: Fang Wang stated:

33                 "Fiscal year ended June 30, 2016, we realize the revenue at $268.8 million, com-
34     pared
35                 to $263.4 million for the previous fiscal year ended on June 30, 2015….. For the
36                 fiscal year ended June 30, 2016, Gufeng's net sales were $134 million. It's an in-
37                 crease of $6 million or nearly 5% from $129 million over a year ago. This increase
38                 is mainly attributable to the momentum of growth in Gufeng sales for the whole
39                 fiscal year for its market promotion strategy as well as the sales effort."
40

1    On Oct 17, 2016, CGA Reported and filed 2016 10-k. Stated:

2    **"Results of Operations**

3

4    ***Fiscal Year ended June 30, 2016 Compared to the Year ended June 30, 2015***

| | **2016** | **2015** | **Change** | **Change %** |
|---|---|---|---|---|
| Sales | $ | $ | $ | |
| Jinong | 125,716,937 | 130,355,168 | -4,638,231 | -3.6 % |
| Gufeng | 134,661,420 | 128,675,606 | 5,985,814 | 4.7 % |
| Yuxing | 8,406,663 | 4,323,514 | 4,083,149 | 94.4 % |
| Net sales | 268,785,020 | 263,354,288 | 5,430,732 | 2.1 % |

5

6

7    *"Revenue recognition*

8    Sales revenue is recognized at the date of shipment to customers when a formal arrange-
9    ment exists, the price is fixed or determinable, the delivery is completed, we have no other
10    significant obligations and collectability is reasonably assured. Payments received before
11    all of the relevant criteria for revenue recognition are satisfied are recorded as unearned
12    revenue."

13

14    "Below is a table that shows the metric tons of fertilizer sold by Jinong and Gufeng and the

15    revenue per ton for the periods indicated:

| | Year Ended June 30, | | Change 2015 to 2016 | |
|---|---|---|---|---|
| | 2016 | 2015 | Amount | % |
| | (metric tons) | | | |
| Jinong | 55,259 | 74,351 | (19,092 ) | (25.7 |
| ***Gufeng*** | ***358,374*** | ***287,428*** | ***70,946*** | ***24.7*** |
| | 413,633 | 361,779 | 51,854 | |

| | Year Ended June 30, | |
|---|---|---|
| | 2016 | 2015 |
| | (revenue per tons) | |
| Jinong | $    2,275 | $    1,913 |
| ***Gufeng*** | ***376*** | ***407*** |

16    For the fiscal year ended June 30, 2016, we sold approximately 413,633 metric tons of ferti-

17    lizer products, as compared to 361,779 metric tons for the fiscal year ended June 30, 2015. For the

18    fiscal year ended June 30, 2016, Jinong sold approximately 55,259 metric tons of fertilizer products,

19    as compared to 74,351 metric tons for the fiscal year ended June 30, 2015. For the fiscal year ended

20    June 30, 2016, Gufeng sold approximately 358,374 metric tons of fertilizer products, as compared

21    to 287,428 metric tons for the fiscal year ended June 30, 2015. "

"**Seasonality**

 The peak season to sell fertilizer products was from January through June. However, during the fiscal year ended June 30, 2016, Jinong did not experience seasonal variation with respect to its fertilizer sales since approximately 47.5% of its annual sales revenue occurred in the third fiscal quarter (winter) and the fourth fiscal quarter (spring). ***Gufeng's sales of compound fertilizer has undergone significant seasonal variation in China. Correspondingly, the purchase of its raw material, basic fertilizers, is affected by the supply and demand in the fertilizer market with seasonality. Over non-peak sales season, when the raw material price is low, Gufeng still places larger orders for raw material as its export business offset the seasonality when exportation made to southern Asia, such as India, where their selling are on corresponds to the non-peak season in China***."

On Nov 14, 2016, CGA issued a press release discussing its financial results for the first quarter 2017

ended Sec 30, 2016, Stated the following :

"Net sales of first quarter of Fiscal Year 2017 increased 14.2% to $61.9 million,  beating guidance $1.9 million; net income increased 1.5% to $7.4 million, beating guidance $0.4 million; with EPS of $0.20, beating guidance $0.01.
The Company provides guidance range for second quarter of Fiscal Year 2017: Revenue, Net Income and EPS of between $60 million and $65 million, $5 million and $7 million, and $0.13 and $ 0.19 based on approximately 37.6 million fully diluted shares, respectively.
The Company confirms guidance range for Fiscal Year 2017 as the following: Revenue, Net Income and EPS of between $277 million and $300 million, $20 million and $27 million, and $0.53 and $0.72 based on approximately 37.6 million fully diluted shares, respectively
……
For the three months ended September 30, 2016, ***Gufeng's net sales were $15.8 million***, a decrease of $2.4 million, or 13.3% from $18.2 million for the three months ended September 30, 2015. This decrease was mainly attributable to Gufeng's lower selling prices to answer market demand during the three months ended September 30, 2016."
.

On Nov 14, 2016, Same day, CGA also held a Q1 2017 earnings Conference call. CEO Tao Li  and

CFO Assistant Fang Wang hosted the conference call. Fang Wang stated

"I'm pleased to report results for the first quarter of fiscal year 2017. For the fiscal first quarter ended September 30, 2016 revenues were 61.9 million as compared to 54.2 million for the fiscal first

quarter ended September 30, the year of 2015. ……

……

For the three months ended September 30, the year of 2016, ***Gufeng's net sale was 15.8 million***, a

decrease of 2.4 million or 13.3% from 18.2 million for the three months ended September 30, the

1    year of 2015. This decrease was mainly due to Gufeng's lower starting price to answer the market

2    demand for the three months ended September 30, the year of 2016."

3    On Nov 14,same day, 2016, CGA Reported and filed 2016 10-k. Stated the following:

4         "Total net sales for the three months ended September 30, 2016 were $61,884,622, an in-
5         crease of $7,700,351 or 14.2%, from $54,184,271 for the three months ended September
6         30, 2015. …..
7         ……

|  | Three Months Ended September 30, | |
|---|---|---|
|  | 2016 | 2015 |
| Revenues from unaffiliated customers: | | |
| *Jinong* | $ *31,427,720* | $ *34,707,804* |
| Gufeng | 15,809,514 | 18,234,832 |
| Yuxing | 1,355,411 | 1,241,635 |
| VIEs | 13,291,977 | 0 |
| Consolidated | $ 61,884,622 | $ 54,184,271 |

8    On May 15, 2017, CGA issued a press release discussing its financial results for the Third quarter
9    2017 ended March 31, 2017, Stated the following :

10       Net sales increased 3.4% to $81.3 million; Net income was $8.2 million, beating guidance
11       by $1.2 million; with EPS of $0.21, beating guidance by $0.03.
12       Guidance for Fourth Quarter of 2017 Fiscal Year: Revenue of $80 million to $100 million;
13       Net Income of $4 million to $8 million; EPS of $0.10 to $0.21, based on 38.6 million fully
14       diluted shares.
15       The Company raises the guidance for Fiscal Year 2017: Revenue of $281 million to $301
16       million; Net Income of $25 million to $29 million; EPS of $0.65 to $0.75, based on 38.6
17       million fully diluted shares.
18       ……
19       For the three months ended March 31, 2017, Gufeng's net sales were $30,858,499, a de-
20       crease of $12,903,559 or 29.5% from $43,762,058 for the three months ended March 31,
21       2016. This decrease was mainly attributable to Gufeng's lowering selling prices and vol-
22       umes to answer market demand during the three months ended March 31, 2017.
23    Defendant Li's comment was quoted and   Tao Li, Chairman and Chief Executive Of-
24    ficer commented:
25       ." Looking ahead to the 2017 Fiscal Year, we expect to reach revenue of $281 to $301 mil-
26       lion; net income of $25 to $29 million; and EPS of $0.65 to $0.75, based on 38.6 million
27       fully diluted shares."
28    On May 15, 2017, Same day, CGA also held a Q3 2017 earnings Conference call. Defendant Li and

29    CEO Tao Li hosted the conference call. Tong Sha Lu Stated the following:

30    "Our call today is hosted by Richard Zhuoyu Li, the Company's President; and Mr. Tao Li, the

31    Company's Chairman and Chief Executive Officer.

1    …….

2    For the fiscal third quarter ended March 31, 2017, revenues were $81 million - $81.3 million as

3    compared to $78.6 million for this fiscal third quarter ended March 31, 2016. Net income for the

4    third quarter was $8.2 million or $0.21 per share, as compared to $8.3 million or $0.22 per share..

5    ……

6    ……

7    For the three months ended March 31, 2017, Gufeng's net sales were $30,858,499, a decrease of

8    $12,905,559 or 29.5% from $43,362,058 for the three months ended March 31, 2016. This increase

9    [ph] was mainly attributable to Gufeng's lower selling prices and volumes to answer market demand

10   during the three months ended March 31, 2017..”

11

12   On May 15,same day, 2017, CGA Reported and filed Q3 2017 10-q. Stated the following:

13         “Total net sales for the three months ended March 31, 2017 were $81,305,628, an increase
14   of    $2,667,154, or 3.4%,  from $78,638,474 for the three months ended March 31, 2016.
15         ……
16         Below is a table that shows the metric tons of fertilizer sold by Jinong and ***Gufeng*** and the

17   revenue per     ton for the periods indicated:

18

| | Three Months Ended March 31, | | Change from 2016 to 2017 | |
| --- | --- | --- | --- | --- |
| | 2017 | 2016 | Amount | % |
| | (metric tons) | | | |
| Jinong | 14,455 | 8,932 | 5,523 | 61.8 % |
| Gufeng | 90,235 | 121,668 | (31,433 ) | (25.8 )% |
| | 104,690 | 130,600 | (25,910 ) | (19.8 )% |

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2017 | 2016 |
| | (revenue per ton) | |
| Jinong | $ 1,821 | $ 3,538 |
| Gufeng | 342 | 360 |

| | Nine months Ended March 31, | | Change from 2016 to 2017 | |
| --- | --- | --- | --- | --- |
| | 2017 | 2016 | Amount | % |
| | (metric tons) | | | |
| Jinong | 39,740 | 28,535 | 11,205 | 39.3 % |
| Gufeng | 198,933 | 230,065 | (19642 ) | (11.0 )% |
| | 238,673 | 258,600 | (19927 ) | (7.7 )% |

| | Nine months Ended March 31, | |
| --- | --- | --- |
| | 2017 | 2016 |
| | (revenue per ton) | |
| Jinong | $ 2,128 | $ 3,420 |
| Gufeng | 340 | 372 |

For the three months ended March 31, 2017, we sold approximately 104,690 metric tons of fertilizer products, as compared to 130,600 metric tons for the three months ended March 31, 2016. For the three months ended March 31, 2017, Jinong sold approximately 14,455 metric tons of fertilizer products, an increase of 5,523 metric tons, or 61.8%, as compared to 8,932 metric tons for the three months ended March 31, 2016. For the three months ended March 31, 2017, *Gufeng sold approximately 90,235 metric tons of fertilizer products, as compared to 121,668 metric tons for the three months ended March 31, 2016.*

**B.  REASONS FOR FALSITY**

**I. Based on CGA defined "Revenue recognition", The true shipment volumes were extremely departed from the magnitude stated in CGA's 10-k and 10-q reports..**

Among the various financial elements, revenue is the most critical therefore called "top line" as the revenue directly reflects an entity's business and production activity.  Without revenue all the other of data including income, called "bottom line", will not even exist and if revenue is wrong

12

1    logically all the other data would be wrong. In CGA's financial reports, defendant clearly defines

2    "Revenue recognition": "Sales revenue is recognized at the date of shipment to customers". There-

3    fore, to verify the revenue general accuracy, the most straight forward  way is to stand by the facto-

4    ry gate counting the number of shipping trucks in-out for estimated shipping volume. Plaintiff

5    adapted such procedures which performed by i. himself, ii. his friend and iii. an engaged local resi-

6    dent.

7    **i) By himself**.

8    Gufeng factory is located about 40 miles of east to Beijing.  Plaintiff personally visited three times.

9    All in the CGA defined  Gufeng's "peak season to sell fertilizer .

10   In,first trip to China.Plaintiff visited Gufeng twice.  Plaintiff was attending CGA's annual meeting

11   in June 2018. Before Plaintiff went to the annual meeting at CGA's headquarter office in Xi'an

12   China, Plaintiff requested CGA ***twice*** by emails for permission of site visiting to Gufeng factory.

13   CGA did not respond my first request of email of May 15,2018. Later, CGA responded to my 2nd

14   email, while still ignoring my visiting Gufengt request, saying they would arrange me to visit their 2

15   subsidiaries, Jinong and Yuxing, in Xi'an area when attending the annual meeting. However, Plain-

16   tiff still eager to visiting Gufeng. He visited Gufeng anyway on May23, by just viewing from out-

17   side. He stayed there for 2 hours and only saw 2 trucks parked outside factory waiting for loading

18   when shipment ready.  During the meeting, I asked defendant Li again in person for visiting

19   Gufeng. Li told me the factory was in the maintenance period at that time and it would resume nor-

20   mal production by end of June and He promised to arrange the site visit for me then. However, later

21   in July 16 when Plaintiff requested for the real visit to Gufeng, no one responded my email request

22   anymore.

23   Without their permission, Plaintiff visited the site anyway on July 20.  However Plaintiff was still

24   only able viewing from outside of the factory. Plaintiff stayed outside for 2 hours, did not see any

25   truck there. Plaintiff optimistically assumed the scheduled maintenance had not finished.

1   Between May and July 2018, as stated above, Plaintiff requested visiting Gufeng 4 times and did

2   not get any permission, even though Defendant Li personally promised to arrange it. Defendant Li

3   intentionally prevent Plaintiff from site visit to Gufeng factory hiding the truth from Plaintiff, even

4   lied by saying "Gufeng was in maintenance". The excuse is conflicted with CGA's statement about

5   "**Seasonality**" in every 10-ks listed in the previous section DEFENDANTS' FALSE AND MIS-

6   LEADING STATEMENTS. 10-k  2018 clearly stated "The peak season to sell fertilizer products is

7   from January through June…… Usually, Gufeng's sales of compound fertilizer undergoes signifi-

8   cant seasonal variation in China. Correspondingly, during the fiscal year ended June 30, 2018,

9   Gufeng experienced seasonal variation". How it could be true, that Gufeng arranged maintenance

10  period in the peak season? Plaintiff's four time visiting requests just happened the peak season.

11  In second trip to China. At that time, Plaintiff had suspected Defendants and knew they would block

12  my visit to Gufeng. Therefore, Plaintiff visited Gufeng factory before noon on March 27, 2019

13  without contacting Defendants. During the 3 hours visit, I saw 2 trucks. One was waiting outside

14  and another one was loading by a warehouse inside the factory.  The exit gate was permanently

15  sealed. Refer the below picture Plaintiff took.

1





1

2  **ii) By Plaintiff's friend**.

3  Plaintiff also sent a friend to observe the factory on Oct 18, 2019. During his 3 hours stay, He did

4  not see any truck. He videoed on site.

5  **iii) By an engaged local resident**.

6  The most valuable and effective monitoring was from a local observer who was able to watch the

7  factory all day and every day.

8  **In addition**, Plaintiff also had phone conversations with four of former and current Gufeng workers

9  including a bookkeeper.

10  Then Plaintiff got confirmation, all the sold and shipped fertilizer tonnage of Gufeng listed in each

11  and every quarterly and annual report officially filed with SEC are false and  intentionally for mis-

12  leading purpose.

13  The result is shocking.

16

1    Listed In previous section the  two tables below which are copied from CGA's annual reports shows

2    metric tons fertilizer sold by Gufeng and revenue per ton for the relevant period.

Below is a table that shows the metric tons of fertilizer sold by Jinong and Gufeng and the revenue per ton for the periods indicated:

| | Year Ended June 30, | | Change 2018 to 2019 | |
|---|---|---|---|---|
| | 2019 | 2018 | Amount | % |
| | (metric tons) | | | |
| Jinong | 65,219 | 47,487 | 17,732 | 37.3% |
| Gufeng | 389,544 | 308,098 | 81,446 | 26.4% |
| | 454,763 | 355,585 | 99,178 | 27.9% |

| | Year Ended June 30, | |
|---|---|---|
| | 2019 | 2018 |
| | (revenue per tons) | |
| Jinong | $    1,214 | 2,123 |
| Gufeng | 356 | 377 |

For the fiscal year ended June 30, 2019, we sold approximately 454,763 metric tons of fertilizer products, as compared to 355,585 metric tons for the fiscal year ended June 30, 2018. For the fiscal year ended June 30, 2019, Jinong sold approximately 65,219 metric tons of fertilizer products, as compared to 47,487 metric tons for the fiscal year ended June 30, 2018. For the fiscal year ended June 30, 2019, Gufeng sold approximately 389,544 metric tons of fertilizer products, as compared to 308,098 metric tons for the fiscal year ended June 30, 2018.

3

Below is a table that shows the metric tons of fertilizer sold by Jinong and Gufeng and the revenue per ton for the periods indicated:

| | Year Ended June 30, | | Change 2016 to 2017 | |
|---|---|---|---|---|
| | 2017 | 2016 | Amount | % |
| | (metric tons) | | | |
| Jinong | 51,506 | 55,259 | (3,753) | (7.3)% |
| Gufeng | 309,882 | 358,374 | (48,492) | (15.6)% |
| | 361,388 | 413,633 | (52,245) | |

| | Year Ended June 30, | |
|---|---|---|
| | 2017 | 2016 |
| | (revenue per tons) | |
| Jinong | $    2,070 | 2,275 |
| Gufeng | 337 | 376 |

For the fiscal year ended June 30, 2017, we sold approximately 361,388 metric tons of fertilizer products, as compared to 413,633 metric tons for the fiscal year ended June 30, 2016. For the fiscal year ended June 30, 2017, Jinong sold approximately 51,506 metric tons of fertilizer products, as compared to 55,259 metric tons for the fiscal year ended June 30, 2016. For the fiscal year ended June 30, 2017, Gufeng sold approximately 309,882 metric tons of fertilizer products, as compared to 358,374 metric tons for the fiscal year ended June 30, 2016.

4

5    According to the above data from CGA's statement,   Gufeng sold approximately 389,544 metric

6    tons of fertilizer products in 2019; 308,098 metric tons in 2018; 309,882 metric tons in 2017.

7    358,374 metric tons in 2016. Therefore, on average, yearly shipment is about 341,374 metric tons.

This number is only for finished products sold. To make the products, at least the same amount raw materials are needed and shipped in. Therefore, 341,374 times 2, shipping volume in and out together totally should be 682,949 metric tons. If 300 days are normal working days a year, 682,949 is divided by 300 days, each working day should be 2,238 metric tons shipment passing through the entrance of the factory.  Suppose average load capacity of each truck is 30 metric tons. It is very reasonable because heavy truck is able to carry 40 tons and light truck less than 10 tons from small farmers, who brought their own raw materials to let Gufeng for processing and recent 4 years most trucks seen from those small farmers. Therefore, we can expect at least 75 trucks passing the entrance gate.

However, the truth is during the relevant period, based on the local observer estimates, average traffic in-out traffic had been less than 2 trucks a day. Sometime, not even 5 truck a week. Therefore, only by counting the trucks, The confirmed result is defendants inflated the revenue of Gufeng factory over 30 times (75/2).

The factory has two gates: the main entrance for trucks entering and another gate for trucks exit. Because very few truck traffic, the factory even permanently sealed the exit gate in late 2018 to save a little salary for gate keeper for the exit gate. Refer the pictures below taken by Plaintiff. One showing exit gate before sealed was taken in 2018 another after sealed was taken in 2019. The local observer recalled when the business was good 10 years ago, the trucks waiting to enter the factory

1    always formed half-mile long line.



2

3



1

**II. Very few employees working inside factory**.

Another evidence proving the factory idleness is very few workers inside.  Because the factory pro-

duction activity is almost stalled, there were very few employees working inside the factory. Total

people inside are less than 30, and most of them were office personnel, very few production line

workers, based on the daily observation by the local observer. He also told the Plaintiff "when the

factory had very good business 10 years ago, the factory needed about 300 workers with 2 shifts."

The factory has about eleven production lines but only #1 production line is newer and  all the rest

are not equipped with a modern automatic production line therefore still heavily rely on enough la-

bors for normal production. In fact, the employee number then was even bigger than three handreds

in 2010. 2010 Form 10-Ks stated Gufeng had 360 employees in 2010 300 by Gufeng and 30 by

Tianjuyuan.; 486 employees in 2011, 458 are employed by Gufeng and 28 are employed by

Tianjuyuan stated on 10-k 2011.

One of former employee told Plaintiff the fact: The only newer product line in the manufacture shop

#1 was only used about a year after installed because low sales volume. All the limited sales of

products were manufactured in some of the other workshops numbered 2 to 11 with original pro-

duction lines. Each original production line needs about 10 workers to for production. However,

most of ships kept idle. The cause behind employees count dramatic decrease is dramatic drop of

20

the sales order therefore dramatic cut of production. Gufeng did not need so many workers any-

more. Defendants admitted "the Company ceased disclosing its employee figures after 2015". Why?

After 2015, Gufeng's employees-count cut another 80% gradually, only kept less than 30 key work-

ers. Then,Gufeng cut another over 50% key workers again in 2019. This cut caused flooding of law-

suit filed by left employees, total 45 legal cases.(ECF69 ex1). About 15 key workers with Gufeng

for over 15 years filed in at local court, including original and appeal.. Now, only about 10 produc-

tion line permanent employees remained with Gufeng.

Now Plaintiff has shown cogently how intentionally CGA blatantly fabricated Gufeng's shipment

data or revenue data almost out of nothing.


## ALLEGATION 2: GUFENG'S INVENTORIES ARE

## MATERIALLY FALSE AND MISLEADING

**A. DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

On Sep. 28, 2017, CGA Reported and filed 2017 10-k. Stated the following:

we own an additional 17,930 square meters (approximately 192,997 square feet) of manufacturing,

office and warehouse space"

*"Inventories*

We had inventories of $78,013,891 as of June 30, 2017, as compared to $87,436,315 as of June 30, 2016, a decrease of $9,422,424, or 10.8%. The principal reason for the decrease is attributed to the decrease of Gufeng's inventory. As of June 30, 2017, ***Gufeng's inventory was $54,444,465, compared to $60,183,741 as of June 30, 2016***.
......
Inventory is valued at the lower of cost (determined on a weighted average basis) or market. Inventory consist of raw materials, work in process, finished goods and packaging materials. The Company reviews its inventories regularly for possible obsolete goods and establishes reserves when determined necessary. At June 30, 2017 and 2016, the Company had no reserve for obsolete goods.
......

NOTE 3-INVENTORIES
Inventories consisted of the following:

|  | June 30, 2017 | June 30, 2016 |
|---|---|---|
| Raw materials | $ 39,397,711 | $ 29,926,762 |
| Supplies and packing materials | $ 540,151 | $ 444,373 |
| Work in progress | $ 421,496 | $ 408,820 |
| Finished goods | $ 37,655,533 | $ 56,656,360 |
| Total | $ 78,013,891 | $ 87,436,315 |

During the year ended June 30, 2017, the Company sold compound fertilizers (finished goods) to certain parties at market price, and purchased equivalent amount of simple fertilizers (raw material) from the same parties also at market price. The simple fertilizers purchased, along with other materials were used in the Company's production facility to manufacture compound fertilizers. While nonmonetary, the sales and purchase transactions were consummated independently under separate agreements at different times, and measured at the prevailing market value. The total amount of nonmonetary sales and purchases amounted to $58,205,442 during the year ended June 30, 2017. No gain or loss incurred as the result of the nonmonetary transactions.

On Oct 15, 2019, CGA Reported and filed 2019 10-k. Stated the following:

"Through Gufeng and Tianjuyuan, we own an additional 17,930 square meters (approximately 192,997 square feet) of manufacturing, office and warehouse space

……

*Inventories*
We had inventories of $162,013,889 as of June 30, 2019, as compared to $53,784,814 as of June 30, 2018, an increase of $108,229,075, or 201.2%. The principal reason for the increase is attributed to the increase of Gufeng's inventory. As of June 30, 2019, Gufeng's inventory was $141,210,160, compared to $31,617,519 as of June 30, 2018, an increase of $109,592,641, or 346.6%.
……
Inventory is valued at the lower of cost (determined on a weighted average basis) or market. Inventories consist of raw materials, work in process, finished goods and packaging materials. The Company reviews its inventories regularly for possible obsolete goods and establishes reserves when determined necessary. At June 30, 2017 and 2016, the Company had no reserve for obsolete goods.
……
NOTE 3-INVENTORIES

1    Inventories consisted of the following:

|  | 30-Jun 2019 | | 30-Jun 2018 | |
|---|---|---|---|---|
| Raw materials | $ | 102,268,620 | $ | 13,154,465 |
| Supplies and packing materials | $ | 496,138 | $ | 566,254 |
| Work in progress | $ | 390,708 | $ | 417,130 |
| Finished goods | $ | 58,858,423 | $ | 39,646,965 |
| Total | $ | 162,013,889 | $ | 53,784,814 |

2

3    During the year ended June 30, 2019, the Company sold compound fertilizers (finished goods) to
4    certain parties at market price, and purchased equivalent amount of simple fertilizers (raw material)
5    from the same parties also at market price. The simple fertilizers purchased, along with other ma-
6    terials were used in the Company's production facility to manufacture compound fertilizers. While
7    nonmonetary, the sales and purchase transactions were consummated independently under sepa-
8    rate agreements at different times, and measured at the prevailing market value. The total amount
9    of nonmonetary sales and purchases amounted to $134,655,878 during the year ended June 30,
10   2019. No gain or loss incurred as the result of the nonmonetary transactions"

11   Below is the table summarizing Gufeng's inventories stated in the relevant CGA's annual (10K)

12   and quarterly (10Q) reports:

| Report | 1st quarter 10q | 2nd quarter 10q | 3rd quarter 10q | Annual report 10k |
|---|---|---|---|---|
| 2016 | $86,243,536.00 | $129,195,214.00 | $88,450,367.00 | $60,183,741.00 |
| 2017 | $51,647,180.00 | $38,703,152.00 | $19,873,778.00 | $54,444,465.00 |
| 2018 | no show | no show | no show | $31,617,519.00 |
| 2019 | $64,037,393.00 | $86,710,252.00 | $108,304,666.00 | $141,210,160.00 |
| 2020 | $125,956,806.00 | $91,994,547.00 | | |

19

20   **B. REASONS FOR FALSITY**

21   **I. Simple calculation proved CGA needs 7 times or bigger warehouse being able hold CGA**

22   **stated inventories.**

23   CGA defined "Inventory is valued at the lower of cost (determined on a weighted average basis) or

24   market. Inventories consist of raw materials; work in process, finished goods and packaging materi-

25   als."

23

1   The stated inventory number is extremely unreasonable. Since his 3rd visit in March, 2019 , Plaintiff

2   uses inventory  $108,304,666 in Q3 2019 performs "back-of-the-napkin" math. We may also use

3   inventory  $141,210,160 in 10k 2019 to do the calculation. Using the finished product revenue price

4   $356/ton as standard listed in the same report. As defined by CGA about half inventories are fin-

5   ished product at market price $356/ton, another half portion mainly is raw materials. The ratio

6   between finished and raw materials should be as same as the radio between cost of goods sold and

7   revenue in the 10-k. which is 229,678,123 / 294,320,803. It is 78% of finished product. Therefore,

8   reasonable cost of raw materials should be 356 x 78%= $278.

9    Now we got 161,167 tons of finished product inventory and 194,792 tons of raw materials invento-

10  ry, 2019, Total is 355, 959 tons of combined inventory at end of March 31 and 210,124 tons of fin-

11  ished inventories and 253,975 tons of raw materials inventories. Total 464,099 inventories at end of

12  June 30.

13  Based on  www.aqua-calc.com, a popular website, "the 961 kilograms [kg] of Fertilizer, acid phos-

14  phate fit into 1 cubic meter". The actual density of fertilizer one ton should be 1.04 cubic meter. So,

15  For simplicity, we just take one ton equivalent to one cubic meter. So we need warehouse space of

16  355,959 cubic meter at March 31, 2019 and 464, 099 cubic meter at June 30, 2019 to fit the stated

17  inventories.

18     Plaintiff count the warehouse space strictly based on the disclosure statement of CGA financial

19     report.

20        "we own an additional 17,930 square meters (approximately 192,997 square feet) of manu-
21        facturing, office and warehouse space"
22





The picture from Google Map is top view of Gufeng campus. If we deduct 2,930 square meter of manufacturing, office space, total warehouse space of Gufeng will be 15,000 square meter. Then deducting working area for stacker trucks, usable for storage space left will be less than 12,000 square meters. How to fit 355,959 cubic meter at March 31, 2019 and 464, 099 cubic meter at June 30, 2019 onto the 12,000 square meter space? 355,959 /12,000, a basic calculation result is the inside of warehouses has to be almost 30 meter high at March 31,2019 or . 464, 099 / 12,000, a basic calculation result is the inside of warehouses has to be almost 30 meter high at March 31,2019 39 meter high on June 30, 2019. However, warehouse itself from ground to the roof is less than 5 meters high. Refer the picture comparing the heights of the white

26   simple building left by exit gate with the right warehouse cross. To the most, the warehouse is just

1  half story higher than the first story ( less then 3 meter) of the simple building.   Besides, finished

2  products cannot just be stacked top each other. They have to be packed in 50kg bags stacked up on

3  pallets. The pallets also occupy space. Realistically the max height of stacks is 5 meter with pallets.

4  So, the stated inventories absolutely do not fit inside Gufeng's limited warehouse space, Gufeng

5  needs 5 times more warehouse spaces.

6  Further more, The above mentioned inventories, even do not include more finished and raw materi-

7  als hiding out of the calculation. Refer to the previous section, CGA stated in each year 10-k under

8  Note-3 inventories subject. We still use 10-K 2019 statementouse space on March 31, 2019 and 7

9  times more warehouse spaces June 30 2019.

10  "" During the year ended June 30, 2019, the Company sold compound fertilizers (fin-
11  ished goods) to certain parties at market price, and purchased equivalent amount of
12  simple fertilizers (raw material) from the same parties also at market price. The simple
13  fertilizers purchased, along with other materials were used in the Company's produc-
14  tion facility to manufacture compound fertilizers. While nonmonetary, the sales and
15  purchase transactions were consummated independently under separate agreements at
16  different times, and measured at the prevailing market value. The total amount ***of***
17  ***nonmonetary sales and purchases amounted to $134,655,878*** during the year ended
18  June 30, 2019. No gain or loss incurred as the result of the nonmonetary transactions"

19  Those goods of "The total amount of nonmonetary sales and purchases amounted to $134,655,878

20  during the year ended June 30, 2019" physically need spaces to stay, although they did not recorded

21  in the financial statement. We just count the goods higher value at $356, $134,655,878 / $356, the

22  result is 379,312 tons therefore , additional 379,312 cubic meters needed. If counting this, CGA

23  needs total 10 times more warehouse space than the spaces CGA has.

24  Therefore, Gufeng's inventory  number is complete fake.  As a matter of fact,  inventories did not

25  even exist. Besides simple calculation based on the conflict CGA's own statement, next, Plaintiff

26  will further proves the judgment the following personal close observation. In front of empty ware-

27  house of CGA.

28  **II, Plaintiff saw the warehouse almost empty by his own eyes**.

29  When Plaintiff visited the factory, in May and July 2018,   he already saw clearly through the exit

30  gate, all the warehouses on sight were almost empty with only several pallets there! Please refer the

picture of "exit gate before sealed. When Plaintiff taking picture, he was just less than 30 feet away

from the closest warehouse and able to see clearly through inside the warehouse. Plaintiff even

could see relatively clear next opening of the warehouse next to the first one. It is also same empty.

## ALLEGATION 3: GUFENG'S VAT and EIT ARE

## MATERIALLY FALSE AND MISLEADING

## A. DEFENDANTS' FALSE AND MISLEADING STATEMENTS

On Oct 28, 2018, CGA reported and filed 10-k 2018, anuual report for fiscal year 2108 ended 6-30-

2018. The relevant Statement as follows:

**Income Taxes**
Jinong is subject to a preferred tax rate of 15% because of its business being classified as a High-
Tech project under the PRC Enterprise Income Tax Law ("EIT") that became effective on January
1, 2008. Jinong incurred income tax expenses of $ 3,501,354 for the fiscal year ended June 30,
2018, as compared to $3,521,978 for the fiscal year ended June 30, 2017, a decrease of $20,624 or
0.6%.
***Gufeng is subject to a tax rate of 25%, and incurred income tax expenses of $2,471,593 for the
fiscal year ended June 30, 2018, as compared to $2,148,326 for the fiscal year ended June 30,
2017, an increase of $323,267, or 15.0%.***
Yuxing has no income tax for the years ended June 30, 2018 and 2017 because of being exempted
from paying income tax due to its products falling into the tax exemption list set out in the EIT.

*Net Income (Loss)*
Net income (loss) for the fiscal year ended June 30, 2018 was $(6,931,225), a decrease of
$32,083,379, or 127.6%, compared to $25,152,154 for the fiscal year ended June 30, 2017. The
decrease was mainly attributable to the estimated net charge of $29,010,535 related to the repatria-
tion tax. Net income (loss) as a percentage of total net sales was approximately (2.4)% and 8.8%
for the fiscal year ended June 30, 2018 and 2017, respectively.
…..
**NOTE 11 – TAXES PAYABLE**

**Enterprise Income Tax**
Effective January 1, 2008, the Enterprise Income Tax ("EIT") law of the PRC replaced the tax
laws for Domestic Enterprises ("DEs") and Foreign Invested Enterprises ("FIEs"). The EIT rate of
25% replaced the 33% rate that was applicable to both DEs and FIEs. The two-year tax exemption
and three-year 50% tax reduction tax holiday for production-oriented FIEs was eliminated. Since
January 1, 2008, Jinong became subject to income tax in China at a rate of 15% as a high-tech
company, because of the expiration of its tax exemption on December 31, 2007. **Accordingly, it
made provision for income taxes for the years ended June 30, 2018 and 2017 of $3,501,354
and $3,521,978, respectively, which is mainly due to the operating income from Jinong.
Gufeng is subject to 25% EIT rate and thus it made provision for income taxes of $2,471,593
and $2,148,326 for the year ended June 30, 2018 and 2017, respectively**.

**Value-Added Tax**
**All of the Company's fertilizer products that are produced and sold in the PRC were subject to a Chinese Value-Added Tax (VAT) of 13% of the gross sales price. On April 29, 2008, the PRC State of Administration of Taxation (SAT) released Notice #56, "*Exemption of VAT for Organic Fertilizer Products*", which allows certain fertilizer products to be exempt from VAT beginning June 1, 2008. The Company submitted the application for exemption in May 2009, which was granted effective September 1, 2009, continuing through December 31, 2015. On August 10, 2015 and August 28, 2015, the SAT released Notice #90. "*Reinstatement of VAT for Fertilizer Products*", and Notice #97, "*Supplementary Reinstatement of VAT for Fertilizer Products*", which restore the VAT of 13% of the gross sales price on certain fertilizer products includes non-organic fertilizer products starting from September 1, 2015, but granted taxpayers a reduced rate of 3% from September 1, 2015 through June 30, 2016.**
......
*Revenue recognition*
 Sales revenue is recognized at the date of shipment to customers when a formal arrangement exists, the price is fixed or determinable, the delivery is completed, we have no other significant obligations and collectability is reasonably assured. Payments received before all of the relevant criteria for revenue recognition are satisfied are recorded as unearned revenue.

*Our revenue consists of invoiced value of goods, net of a value-added tax (VAT)*

..........
During fiscal year 2018, we recorded an estimated net charge of $29.0 million related to the TCJA, due to the impact of the one-time transition tax on the deemed repatriation of deferred foreign income of $292.5 million.
......

**CHINA GREEN AGRICULTURE, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**JUNE 30, 2018**

Tax Rate Reconciliation

Our effective taxes rates were approximately 124.0% and 20.6% for years ended June 30, 2018 and 2017, respectively, with the effect of repatriation tax. Substantially all the Company's income before income taxes and related tax expense are from PRC sources. Actual income tax benefit reported in the consolidated statements of income and comprehensive income differ from the amounts computed by applying the US statutory income tax rate of 34% to income before income taxes for the years ended June 30, 2018 and 2017 for the following reasons:

| | China 15% - 25% | | | United States 27.50% | | | Total | |
|---|---|---|---|---|---|---|---|---|
| Pretax income (loss) | $ 30,338,751 | | | (1,417,849 | ) | | $ 28,920,902 | |
| Expected income tax expense (benefit) | 7,584,688 | 25 | % | (389,908 | ) 27.5 | % | 7,194,779 | |
| High-tech income benefits on Jinong | (3,501,354 | (12.0 | )% | - | - | | (3,501,354 | |
| Losses from subsidiaries in which no benefit is recognized | 2,758,258 | 9 | % | - | - | | 2,758,258 | |
| Change in valuation allowance on deferred tax asset from US tax benefit | - | | | 389,908 | (27.5 | )% | 389,908 | |
| Repatriation Tax | 0 | | | 29,010,535 | | | 29,010,535 | |
| Actual tax expense | $ 6,841,592 | 22.6 | % | $ 29,010,535 | | % | $ 35,852,127 | 124% |

**30-Jun-17**
**Tax Rate Reconciliation**

| | China 15% - 25% | | | United States 34% | | | Total | |
|---|---|---|---|---|---|---|---|---|
| Pretax income (loss) | $ 34,028,617 | | | $ (2,364,584 | ) | | $ 31,664,033 | |
| Expected income tax expense (benefit) | 8,507,154 | 25 | % | (803,958 | ) 34 | % | 7,703,196 | |
| High-tech income benefits on Jinong | (2,033,489 | -6 | % | | | | (2,033,489 | |
| Gains from subsidiaries in which additional benefit is recognized | 38,215 | 0.1 | % | | | | 38,215 | |
| Change in valuation allowance on deferred tax asset from US tax benefit | 0 | | | 803,958 | (34 | )% | 803,958 | |
| Actual tax expense | $ 6,511,880 | 19.1 | % | $ 0 | 0 | % | $ 6,511,880 | 20.60% |

1

29

CHINA GREEN AGRICULTURE, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS FOR THE YEARS ENDED JUNE 30, 2018 AND 2017

| | 2018 | 2017 |
|---|---|---|
| Cash flows from operating activities | | |
| Net income/(loss) | $ (6,931,225 ) | $ 25,152,154 |
| Income from discontinued operations, net of income taxes | 40,394 | 451,608 |
| Income from continuing operations, net of income taxes | (6,971,619 ) | 24,700,546 |
| Adjustments to reconcile net income/(loss) to net cash provided by operating activities | | |
| Issuance of common stock and stock options for compensation | 421,730 | 1,282,080 |
| Gain/loss on discontinuing sales VIE | 331,995 | 0 |
| Depreciation and amortization | 6,200,506 | 17,275,512 |
| Provision for losses on accounts receivable | 15,322,962 | 8,926,204 |
| Gain (Loss) on disposal of property, plant and equipment | 66,482 | 108,309 |
| Amortization of debt discount | 601,510 | 228,292 |
| Change in fair value of derivative liability | (119,713 ) | 29,457 |
| Shares of service | 0 | 41,212 |
| Changes in operating assets | | |
| Accounts receivable | (50,114,067 ) | (30,833,382 ) |
| Amount due from related parties | 724,456 | (910,622 ) |
| Other current assets | 1,762,732 | (2,791,737 ) |
| Inventories | 25,068,160 | 9,788,313 |
| Advances to suppliers | 25,533,988 | 997,780 |
| Other assets | 2,072,008 | (17,116,355 ) |
| Changes in operating liabilities | | |
| Accounts payable | 7,522,043 | 13,415,112 |
| Customer deposits | 212,342 | 398,009 |
| **Tax payables** | **(1,794,827 )** | **(1,374,636 )** |
| Accrued expenses and other payables | 1,017,164 | (2,319,251 ) |
| Interest payable | 290,638 | 251,064 |
| Net cash provided by continuing operating activities | 28,148,489 | 22,095,907 |
| Net cash provided by (used in) discontinued operation | (10,952 ) | (381,943 ) |
| Net cash provided by operating activities | 28,137,537 | 21,713,964 |
| | | |
| Cash flows from investing activities | | |
| Purchase of plant, property, and equipment | (41,114 ) | (42,283 ) |
| Cash paid for acquisition, net | 0 | (127,978 ) |
| Accrued expenses and other payables | 0 | (5,432,372 ) |
| Change in construction in process | (14,359 ) | (210,873 ) |
| Net cash used in continuing investing activities | (55,473 ) | (5,813,506 ) |
| Net cash used in discontinued investing activities | (8,273 ) | 0 |
| Net cash used in investing activities | (63,746 ) | (5,813,506 ) |
| | | |
| Cash flows from financing activities | | |
| Proceeds from loans | 3,129,812 | 5,948,021 |
| Repayment of loans | (6,179,300 ) | (3,154,956 ) |
| Advance from related party | 195,013 | 600,000 |
| Net cash provided by continuing financing activities | (2,854,475 ) | 3,393,065 |
| Net cash provided by discontinued financing activities | 19,011 | 0 |
| Net cash provided by financing activities | (2,835,464 ) | 3,393,065 |
| | | |
| Effect of exchange rate change on cash and cash equivalents | 2,535,774 | 860,540 |
| Net increase in cash and cash equivalents | 27,774,102 | 20,154,063 |
| | | |
| **Cash and cash equivalents, beginning balance** | **123,031,537** | **102,877,475** |
| | | |
| **Cash and cash equivalents, ending balance** | **$ 150,805,639** | **$ 123,031,537** |
| | | |
| Supplement disclosure of cash flow information | | |
| Interest expense paid | $ 303,651 | $ 289,869 |
| **Income taxes paid** | **$ 7,227,660** | **$ 6,899,600** |
| | | |
| Supplement non-cash activities | | |
| Convertible note issued for acquisitions | $ 0 | $ 1,503,277 |
| Derivative liability issued for acquisitions | $ 0 | $ 20,626 |
| Nonmonetary sales and purchases | $ 54,434,270 | $ 58,205,497 |

The accompanying notes are an integral part of these consolidated financial statements.

1

2    B. REASONS FOR FALSITY

1    **A**s Plaintiff contends in the Allegation 1, "Without revenue all the other of data, like income and

2    etc, would not exist".  Because all the revenue numbers in CGA's financial reports are a sheer fabri-

3    cation out of nothing, all their income numbers are also completely false. Even so, to avoid the CIT

4    from US government, Defendants even forged related income tax purported paid in China in the

5    statement., Below table shows Gufeng Income Tax stated in 10-ks :

| Gufeng | Annual Income | Income Tax | Revenue |
|--------|---------------|------------|---------|
| 2016 | 13,952,983.00 | 3,779,145.00 | 134,661,420.00 |
| 2017 | 8,286,761.00 | 2,148,326.00 | 104,446,239.00 |
| 2018 | 10,151,272.00 | 2,471,593.00 | 112,983,573.00 |
| 2019 | 14,076,655.00 | 3,482,862.00 | 136,285,236.00 |

6    Alll the above numbers are collected from CGA's financial statement 10-ks.  are they true? CGA

7    and all individual Defendants knew the data are totally false. Plaintiff's assertion is not purely by

8    logical inference from fake revenue but based solid evidence.

9    In the previous section, Plaintiff copied most of taxed related statement in CGA's Annual report 10-

10   K for fiscal 2018. It is too long, Plaintiff did not copy the date from CGA 2019 10-K  which provide

11   similar fraudulent statement, includes:

12       **"Gufeng is subject to a tax rate of 25%, and incurred income tax expenses of**

13       **$3,482,862 for the fiscal year ended June 30, 2019, as compared to $2,471,593 for the**

14       **fiscal year ended June 30, 2018, an increase of $1,011,269, or 40.9%."**

15   So, Gufeng purported totally paid enterprise income tax (EIT)  $5,954,455.

16   And  based the above table, CGA purported revenue for 2018 and 2019, we can got CGA' total

17   purported revenue for 2018 and 2019  is $249,268,809. Based on CGA stated: **"Our revenue con-**

18   **sists of invoiced value of goods, net of a value-added tax (VAT)"** VAT 13% of  $249,268,809

19   has been payable or already paid to local office of China State Administration of Taxation (SAT).

1  However, from the black/white evidence of pictured screenshot, plaintiff prove CGA actually did

2  not    pay    (EIT)    any    penny    and    paid    only    less    than    $27,000    for    VAT.



3

4  This is a screen shot on conversation between Plaintiff and someone inside SAT, who is worker and

5  knowledgeable Gufeng's Tax payment records.

6  According the screenshot, Between January 1, 2018 and June 30, 2019, 18 months period, Gufeng

7  paid tax rmb599,000 for 2018 whole year and rmb301,000 for first half 2019 including Value-

8  addedTax RMB118,000 for 2018 and 66,000 for first half 2019.  The rest is Land Use Tax

9  Tianjuyuan, Gufeng's subsidiary,  paid Land Use Tax RMB130,000 for 2018 and RMB36,000 for

10  first half of 2019.  Total together, Gufeng/Tianjuyuan only paid RMB1,066,000 equivalent less than

1  USD$160,000  in China and over 80% is Land Use Tax. Gufeng/Tianjuyuan did not pay any corpo-

2  rate income tax because they reported operating loss. They only RMB184,000 (about USD27,000)

3  for VAT . VAT is based not profit. It is based on the sales therefore, calculated based on the actual

4  VAT payment, while CGA reported two years revenue $249,268,809 for Gufeng to US authorities

5  and American investors,. CGA reported Gufeng's revenue $207692  (USD27,000devided by 13%).

6  The difference is astonishing 1200 vs 1. Is it extremely departed from the truth?

7   They did not cheat China government, they did lose money years after years.So, they did not need

8  to tax to China SAT. They dare not to cheat Chinese government because Chinese tax law is tough,

9  if they did cheating, they will go to the prison.

10  They inflated income tax for three reasons：1) coordinated with the fake numbers of income; 2) to

11  offset the deferred income tax or repatriated tax obligation to IRS; as a corporation in US, it is obli-

12  gated to pay income tax on the income from any country in the world after deducting credit of tax

13  paid to local county; 3) they can use this item to steal any amount money from the book.

14  Defendants violated  26 U.S. Code § 7206 - Fraud and false statements: (5) (B)

15  "Withholding, falsifying, and destroying records, Receives, withholds, destroys, mutilates, or falsi-
16  fies any book, document, or record, or ***makes any false statement, relating to the estate or finan-***
17  ***cial condition of the taxpayer*** or other  person liable in respect of the tax;"
18

19  However**,** it is very difficult to catch defendants because Chinese law prohibits releasing this kind of

20  information out of the country unless through SEC and China SEC. But If they do not stop this

21  scheme, they will be caught sooner or later and get punished pursuant to 26 U.S. Code § 7201 - At-

22  tempt to evade or defeat tax

23  "Any  person who willfully attempts in any manner to evade or defeat any tax imposed by this ti-
24  tle or the payment thereof shall, in addition to other penalties provided by law, be guilty of a fel-
25  ony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of
26  a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecu-
27  tion."

28

29  **ALLEGATION 4: CGA'S CASH &**
33

30  **CASH EQUIVALENT NUMBER IS FRAUDULENT**

1   This allegation is for CGA as a whole company.

2   **A.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

3   On Oct 20, 2017, CGA issued a press release discussing its financial results for fiscal year 2017

4   ended 6- 30, 2017, Stated the following:

5   Highlights:
   - Sales increased 6% from $268 million to $285 million; Net Income increased 2% from 24.7 million to $25.2 million; Earning per Share (EPS) of $0.66 for the Fiscal Year 2017; Sales, Net Income, and EPS all met previously raised full year guidance of $285 million, $25 million, and $0.65 per share.
6   "Fiscal Year 2017 has been a critical year for us. We are very pleased with our business
7   results in this volatile market. The guidance-met results proved the steady success of our
8   transition strategy." **Mr. Zhuoyu Li, President of the Company,** continued: "……. We
9   will build **a top-notch manufacturing and distribution platform in the agriculture in-**
10  **dustry in China."**
11

12  On October 20, 2017, CGA also held a earnings Conference call on 10-k, 2017. Defendant Li  host-

13  ed the conference call: Li  stated:

14  "We are very pleased with our consistent performance in the fourth quarter fiscal year 2017,
15  where we continue to build shareholder value and the long-term durability of our business model,
16  sustained net profit and balance sheet discipline
17  In response to a private investor, Max, demanding dividend, Li promised to solve the issue in two
18  months. As below:
19  Zhuoyu Li
20  Hi, Max. This is Zhuoyu Li. …… I didn't mean that there was any difficulties or problems
21  with regarding to paying the dividends. What I said was that, we're trying to figure out
22  what's the most efficient way to pay dividend to our shareholders, so that we can both re-
23  store the shareholders confidence in our company. …..wanted to better deal with the all the
24  regulations of the Chinese polices with regarding to the foreign exchanges.
25  …….
26  Max
27   what we need is action in a few ……, so it is not helpful for us to hope for 2020 or so,
28  nearly everything goes well for the company and you have reached $1 billion of reve-
29  nue …... So what we want to see is, fast action to cannot wait for another three years, many
30  of us are invested since five, six, seven years and invest so much money that you got your
31  salaries, you got your bonus, shares, but we got nothing, we got $0.10 as a dividend two or
32  three years ago, that's nothing. The company has full of cash and we really see it as your
33  top goal to pay us some dividends back.
34
35  Zhuoyu Li
36  …… we will disclose the strategy that we are still developing within the next two months,
37  so that you can see that we're actually taking actions.
38  Max
39  Okay, two months?
40  Zhuoyu Li
41  Within next two months.

1   Unfortunately, this is the last earning conference call. The Shareholders did not hear anything in

2   the promised two months about the expected dividend even did not hear and get the promised

3   dividend for over 4 years. Since then CGA ceased investor relation activities in 2018 until now,

4   has not held any earning call for 18 quarters. The partial likely reason is CGA cannot answer

5   why not giving only $0.1 of dividend with the purported over $100,000,000 cash on hand! The

6   answer is the huge amount of cash on hand never exist!

7   On April 13, 2018, CGA report and filed 10-K/A Annual report amendment for fiscal year end-

8   ed 6-30-2017 .stated followings related tax:

9    For statement of cash flows purposes, the Company considers all cash on hand and in banks,
10   certificates of deposit with state owned banks in the Peoples Republic of China ("PRC") and
11   banks in the United States, and other highly-liquid investments with maturities of three
12   months or less, when purchased, to be cash and cash equivalents. The Company maintains
13   large sums of cash in three major banks in China. The aggregate cash in such accounts and
14   on hand as of June 30, 2017 and 2016 was $122,907,629 and $102,728,991, respectively.
15   There is no insurance securing these deposits in China. In addition, the Company also had
16   $142,919 and $167,495 in cash in two banks in the United States as of June 30, 2017 and
17   2016, respectively. Cash overdraft as of balance sheet date will be reflected as liabilities in
18   the balance sheet. The Company has not experienced any losses in such accounts and be-
19   lieves it is not exposed to any significant risks on its cash in bank accounts.

20   <u>Cash and cash equivalents and concentration of cash</u>
21
22   For statement of cash flows purposes, the Company considers all cash on hand and in
23   banks, certificates of deposit with state owned banks in the Peoples Republic of China
24   ("PRC") and banks in the United States, and other highly-liquid investments with maturi-
25   ties of three months or less, when purchased, to be cash and cash equivalents. The Compa-
26   ny maintains large sums of cash in three major banks in China. The aggregate cash in such
27   accounts and on hand as of June 30, 2018 and 2017 was $150,805,639 and $123,031,537,
28   respectively. There is no insurance securing these deposits in China. In addition, the Com-
29   pany also had $19,902 and $142,919 in cash in two banks in the United States as of June
30   30, 2018 and 2017, respectively. Cash overdraft as of balance sheet date will be reflected
31   as liabilities in the balance sheet. The Company has not experienced any losses in such ac-
32   counts and believes it is not exposed to any significant risks on its cash in bank accounts.
33

F-8

34   **B: REASON FOR FALSY**

35   Each of CGA's Annual and quarterly report contained the data of Cash and cash equivalents and

36   CGA considers all cash on hand and in banks, certificates of deposit and other highly-liquid invest-

1    ments with maturities of three months or less, when purchased, to be cash and cash equivalents. Be-

2    low is the table, data from CGA's annuals reports.

| CGA cash flows for the periods, year ended June 30. | | | | | |
|---|---|---|---|---|---|
| | **2020** | 2019 | 2018 | 2017 | 2016 |
| Net cash provided by operating | (66,196,484) | (71,410,847) | 28,137,537 | 16,302,049 | 34,358,655 |
| Net cash provided by investing | (97,483) | (47,395) | (63,746) | (402,067) | 689,545 |
| Net cash provided by financing | 9,751,265 | 7,761,950 | (2,835,464) | 3,393,065 | (17,102,600) |
| Effect of Exchange rate change on cash | (3,782,324) | (14,849,542) | 2,535,774 | 861,015 | (8,031,678) |
| Net increase in cash/equivalents | (60,625,326) | (78,545,834) | 27,774,102 | 20,154,062 | 9,913,922 |
| Cash/equivalents, beginning balance | 72,259,805 | 150,805,639 | 123,031,537 | 102,896,486 | 92,982,564 |
| **Cash/equivalents, ending balance** | **11,934,738** | **72,259,804** | **150,805,639** | **123,050,548** | **102,896,486** |

3

4    According the above data from CGA's statements, CGA has tremendous cash and cash equivalents.

5    Using the ending balance data divided by total outstanding shares stated in 10-ks:

| 6 | 2020 | 2019 | 2018 | 2017 | 2016 |
|---|---|---|---|---|---|
| 7   Total Shares | 6,350,129 | 3,986,912 | 3,241,413 | 3,211,263 | 3,081,550 |
| 8   Cash of each share | $1.90 | $18.12 | $46.52 | $38.31 | $33.39 |

9

10    However the cash numbers were false: the reported cash simply did not even exist. Among other

11    evidences, the following facts shown in the above CGA's 10ks are the most straightforwardly con-

12    vincing:

13    Based on the data from CGA 10-kof 2020, CGA sold nine times of common shares for cash:

14    On April 25, 2019, the Company entered into a Stock Purchase Agreement (the "SPA") with

15    certain non-US persons, as defined in Regulation S promulgated under the Securities Act of 1933,

16    in connection with a private placement offering of 6,000,000 shares (equivalent 500,000 shares,

17    after 1 for 12 reverse split) of common stock, par value $0.001 per share, of the Company. The

18    purchase price per share of the offering is $1.00 while the book value per share is around $10 (to-

19    tal shareholder's equity/total shares outstanding/12), selling price is 10% of book value per share

20    and less than cash of $1.75 each share( 21 devided by 12).market closing share price $0.50

On May 10, 2019, the Company sold 2,270,000 shares (equivalent 189,167 shares, after 1 for 12 reverse split) of common stock at the price of $1.00 per share for total proceeds of $2,270,000 to certain third-party individuals. While the book value per share is around $8.5 , selling price is 12% of book value , even less than cash of $1.51 each share. market closing price $0.51

On June 25, 2019, the Company approved the amendment to its Articles of Incorporation to affect a 1 for 12 reverse stock splits. The number of outstanding shares of the registrant's common stock on June 30, 2019, was 3,986,912.. market closing price at June 25, $0.49, market closing price $5.54. starting date June 28

During the year ended June 30, 2019, the Company issued an aggregate of 650,000 shares (equivalent 54,166 shares, after 1 for 12 reverse split)  of common stock to pay off consulting services under the 2009 Plan. The value of the stock was $370,500 and is based on the fair value of the Company's common stock on the grant date. Selling price is $0.57 while the book value is $8.5 , selling price is 7%  of book value , even less than cash of $1.75 each share

On July 2, 2019, the Company issued 59,567 shares of common stock to pay off consulting services under the 2009 Plan. The value of the stock was $330,000 and was based on the fair value of the Company's common stock on the grant date. Selling price is $5.5 while the book value per share is $99(total shareholder's equity/total shares outstanding) , selling price is 6%  of book value , even less than cash of $18.12 each share. market closing price $5.47

 On August 13, 2019, the Company sold 212,000 shares of common stock at the price of $10.00 per share for total proceeds of $2,120,000 to certain third-party individuals. while the book value per share is around $97, selling price is 10%  of book value ,even less than cash of $17.12 each share, market closing price $3.65

On August 15, 2019, Shaanxi Baoyu Science and Technology Investment Company, a limited liability investment company incorporated in the People's Republic of China ("Shaanxi Baoyu"), entered into a certain Stock Purchase Agreement (the "SPA") pursuant to Regulation S promulgated under the Securities Act of 1933 with the Company in connection with a private placement of-

1  fering of 471,000 shares of Common Stock, par value $0.001 per share, of the Company. The pur-

2  chase price per share of the offering was $12.00 for total proceeds of $5,652,000. while the  book

3  value per share is around $90 , selling price is 13%  of book value,   even less than cash of $17

4  each share; market closing price $3.47

5

69  On August 19, 2019, the Company sold 248,000 shares of common stock at the price of $10.00

7  per share for total proceeds of $2,480,000 to certain unrelated individuals. while book value per

8  share is around $80, selling price is 13%  of book value ,  even less than cash of $16.8 each share ;

9  market closing price $4.23

1010  On November 15, 2019, the Company issued 995,000 shares of common stock at the price of

11  $5.00 per share for the total amount of $4,975,000 to the holders of the Company's convertible

12  notes payable in connection with the payment of the convertible notes' principal and interests. The

13  convertible notes were issued on June 30, 2016 and matured on June 30, 2019. while the  book

14  value is $70 , selling price is 7%  of book value per share,   even less than cash of $16.67 each

15  share; market closing price $3.60

16

1711  On February 14, 2020, the Company issued 377,650 shares of common stock at the price of $5.00

18  per share to the holders of the Company's convertible notes payable in connection with the payment

19  of the convertible notes' principal and interests. The convertible notes were issued on January 1,

20  2017 with amount of RMB12,000,000 ($1,726,619) and matured on January 1, 2020 with total

21  amount of RMB13,112,723 ($1,888,250) included interests. while the  book value is $50, selling

22  price is 10%  of book value per share, even less than cash of $13.18 each share; market closing

23  price $2.92

24  **From above** 9 times of private placement, CGA Totally issued 3,160,550 shares with proceed

25  $26,085,750 during the period of from April 25, 2019 through February 14, 2020. The average sell-

26  ing price is $8.25. Compared with the average book value per share and cash and cash equivalent

1   per share stated  in CGA's relevant 10-k and 10-q, $8.25 is just around 10% of book value per share

2   and  even less than purported cash on hand  per share. It plausibly indicated no such cash and cash

3   equivalent really in CGA's accounts and CGA desperately needed the real cash. For further more

4   particular allegation, Plaintiff drafted  the below chart with data all picked up collected from CGA

5   10-k and 10q. except calculations and market price which is from Seekingalpha.com

### CGA book value devaluation chart
(Book Value is total Stockholders' Equity, which is assets minus liabilities)
3-31-2019 to 3-31-2020

|  | Total shares Outstanding | Shareholder's Equity | BookValue per share | Cash / Cash Equivalents | Cash /equi per share | Market Price |
|---|---|---|---|---|---|---|
| 2019 q3 3/31/2019 *(1/12) | 3,295,579 | $ 403,657,917.00 | $ 122.48 | $ 69,242,037.00 | $ 21.01 | $ 5.88 |
| 1 to 12 reverse stock split on June 28, 2019 | | | | | | |
| 2019 q4 6/30/2019 10-k | 3,986,912 | $ 396,555,686.00 | $ 99.46 | $ 72,259,804.00 | $ 18.12 | $ 5.54 |
| 2020 q1 9/30/2019 | 4,977,479 | $ 382,454,402.00 | $ 76.84 | $ 82,953,941.00 | $ 16.67 | $ 4.70 |
| 2020 q2 12/31/2019 | 5,972,479 | $ 370,679,505.00 | $ 62.06 | $ 78,706,500.00 | $ 13.18 | $ 2.81 |
| 2020 q3 3/31/2020 | 6,350,129 | $ 315,592,228.00 | $ 49.70 | $ 41,311,137.00 | $ 6.51 | $ 2.60 |

6

7   In the their selling period between March, 2019 and  March, 2020, the CGA's market stock prices

8   were very low, high at $5.54 low at $2.6 and average price around $3.70. The price objectively re-

9   flected the public investors' perception toward CGA's fraudulent financial statements and scheme.

10   The perception is correct. Among other things, the data on assets and cash and cash equivalent was

11   completely fabricated. If Defendants really trusted data on their own filed financial statement, espe-

12   cially book value the cash and cash equivalent, they would not issue CGA stocks at the extremely

13   discounted prices. Instead, the reasonable action taken should be buying back CGA's stock at ex-

14   tremely low price from market.

15   **For example,** On November 15, 2019, CGA issued 995,000 shares about 20% more t of common

16   stock at the price of $5.00 per share for the total amount of $4,975,000. If they really believed their

17   financial state in 2020 Q1 10-Q for quarter ended 9/30/2019, especially the book value is

18   $382,454,402 therefore book value per share is $76.84 and cash per share on hand is $16.67, would

19   they issue the  20% more new shares at $5? Defendants may resort to sophistry: they sold share for

20   $5, which was 39% higher than market price $3.70 therefore it is good deal for the company and all

21   shareholders benefited from the deal by getting more asset. It is not true. The immediate effect was,

1   as previous chart shown, the total outstanding shares increased 20% from 4,977,479 to 5,972,479

2   but book value per share dropped 19% from $76.84 to $62.06 and cash and cash equivalent per

3   share dropped 21% from $16.67 to $13.18. The assets of public shareholders suffered seriously

4   loss!

5   CGA totally issued 3,160,550 shares through nine times private placement in one year period be-

6   tween 3-31-2019 and 3-31-2020, referred on previous chart, the total shares outstanding increased

7   92.3% from 3.295,579 to 6,350,129, but book value per share dropped 59.4% from $122.48 to

8   $49.70, cash and cash equivalent dropped 69% from $21.01 to $6.51 and market stock price

9   dropped 55.8% from $5.88 to $2.60. This is a hard fact, public shareholders interest are significant-

10  ly damaged!

11  They knew the truth clearly and that is why they recklessly sold CGA stock at such low price com-

12  pared with their purported book value and cash in each share.

13  Assuming CGA did have their purported cash and cash equivalent, can they explain why they sold

14  the shares at extremely low price compared with book value and cash per share? the only another

15  plausible explanations are either the private placement are themselves fraudulent or self-dealing and

16  they were trying to convert asset from public investors to their own or related third parties coffers.

17  This is significant dissipation or conversion of assets, significant harm to public shareholders It is

18  the more serious crime exactly described circumstances by SEC Sec 21C (c) (1)

19                          **ALLEGATION 5: CGA's Relation with K&C and KSP is**

20                          **MATERIALLY FALSE AND MISLEADING**

21  **A. DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

22  On April 18, 2017 CGA filed Form 8-K, Current Report. CGA Stated :

24      **Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Ap-**
25      **pointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

27          (a) Effective April 18, 2017, Yiru Shi resigned as a director of China Green Agri-
28      culture, Inc. (the "Company"). Ms. Shi's resignation from the Board of Directors of the
29      Company did not result from any disagreement with the Company.

(d) On April 15, 2017, the Board of Directors, upon the recommendation of its Nominating Committee, appointed Daqing Zhu to serve on the Board. Mr. Zhu will also serve on the Audit Committee, Nominating Committee and Compensation Committee of the Board.

Mr. Zhu, aged 52, has served as the president of Shaanxi Aisuo Consulting Co. Ltd., a company specializing in providing professional management and finance services, since 2014. In 2004, Mr. Zhu founded Shaanxi Xintianyou Auto Dealership Co. Ltd, a dealer-ship of auto sales and services for various brands, including BYD Auto, and had served as its CEO and Chairman of the Board until 2014. In addition to founding and developing commercial businesses, Mr. Zhu had also worked in the public sector since the 1990s. His public administration experience includes working at various agencies and offices of the Shaanxi provincial government from 1990 to 2004. Earlier in his career, in the 1980's, Mr. Zhu was a corporate banking officer at Industrial and Commercial Bank of China in Xi'an. As the corporate leader with responsibility for all aspects of business management, Mr. Zhu has executive level experience in financial management, internal control, marketing to individuals and small businesses, sales, customer care, operations, product management, electronic commerce, financial services, executive compensation, strategic planning, tech-nology, and mergers and acquisitions.

The Board has determined that Mr. Zhu meets the independence standards adopted by the Board in compliance with the New York Stock Exchange corporate governance list-ing standards and Item 407(a) of Regulation S-K.

Mr. Zhu has (i) no arrangements or understandings with any other person pursuant to which he was appointed as a director, and (ii) no family relationship with any director or executive officer of the Company or any person nominated or chosen by the Company to become a director or executive officer.

Mr. Zhu has had (i) no direct or indirect material interest in any transaction or se-ries of similar transactions contemplated by Item 404(a) of Regulation S-K and, (ii) as of the date of this Current Report on Form 8-K, Mr. Zhu holds no direct or indirect beneficial ownership in the Company's stock or rights to acquire the Company's stock.

Mr. Zhu will receive the standard compensation paid by the Company to all of its non-employee directors, pro-rated to reflect the actual time Mr. Zhu will serve on the Company's Board this year. In connection with his appointment, Mr. Zhu will enter into a standard indemnification agreement with the Company in the form previously approved by the Board, which is attached as Exhibit 3.1 to the Company's Current Report on Form 10-QSB filed with the SEC on November 9, 2007 and is incorporated by reference herein.

Two days later, on April 20, 2017 CGA filed Form 8-K, Current Report. CGA Stated :

**ITEM 4.01 Changes in Registrant's Certifying Accountant.**

(a)    *Resignation of Independent Registered Public Accounting Firm.*

On April 19, 2017, Kabani & Company, Inc. ("Kabani") resigned as independent regis-tered public accounting firm for China Green Agriculture, Inc. (the "Company.")
 The audit reports of Kabani on the consolidated financial statements of the Company for each of the two most recent fiscal years ended June 30, 2016 and June 30, 2015 did not

contain an adverse opinion or a disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope or accounting principles.

During the Company's two most recent fiscal years ended June 30, 2016 and June 30, 2015 and during the subsequent interim period from July 1, 2016 through April 19, 2017, (i) there were no disagreements with Kabani on any matter of accounting principles or practices, financial statement disclosure or auditing scope or procedures that, if not resolved to Kabani's satisfaction, would have caused Kabani to make reference to the subject matter of the disagreement in connection with its reports, and (ii) there were no "reportable events" as defined in Item 304(a)(1)(v) of Regulation S-K.

The Company provided Kabani with a copy of the disclosures in this report prior to filing with the Securities and Exchange Commission (the "SEC"). A copy of Kabani's letter, dated April 20, 2017, to the SEC, stating whether it agrees with the statements made in this report, is filed as Exhibit 16.1 to this report.

> (b)    *Engagement of New Independent Registered Public Accounting Firm.*

On April 20, 2017, the Company engaged KSP Group, Inc. ("KSP") as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2017. The decision to appoint KSP was approved by the Audit Committee of the Board of Directors.

During the two most recent fiscal years ended June 30, 2016 and June 30, 2015 and during the subsequent interim period from July 1, 2016 through April 19, 2017, neither the Company nor anyone on its behalf consulted KSP regarding either (i) the application of accounting principles to a specified transaction, either completed or proposed, or the type of audit opinion that might be rendered on the Company's financial statements, and neither a written report nor oral advice was provided to the Company that KSP concluded was an important factor considered by the Company in reaching a decision as to any accounting, auditing or financial reporting issue, or (ii) any matter that was either the subject of a "disagreement" or a "reportable event," each as defined in Regulation S-K Item 304(a)(1)(v), respectively.

ITEM 9.01    Financial Statements and Exhibits.

Exhibit16.1:  Letter from Kabani & Company, Inc. dated April 20, 2017 to SEC

April 20, 2017

Securities and Exchange Commission

100 F Street, N.E.

Washington, DC 20549

Ladies and Gentlemen:

We have read the Item 4.01 of Form 8-K dated April 20, 2017, of China Green Agriculture, Inc. and are in agreement with the statements made regarding our firm. We have no basis to agree or disagree with other statements of the registrant contained therein.

/s/ Kabani & Company, Inc.

## B. REASONS FOR FALSITY

The CGA's statement regarding its relation with KSP is false and misleading.

During the two most recent fiscal years ended June 30, 2016 and June 30, 2015 and during the subsequent interim period from July 1, 2016 through April 19, 2017, neither the Company nor anyone on its behalf consulted KSP regarding either (i) the application of

1    accounting principles to a specified transaction, either completed or proposed, or the type
2    of audit opinion that might be rendered on the Company's financial statements, and neither
3    a written report nor oral advice was provided to the Company that KSP concluded was an
4    important factor considered by the Company in reaching a decision as to any accounting,
5    auditing or financial reporting issue, or (ii) any matter that was either the subject of
6    a "disagreement" or a "reportable event," each as defined in Regulation S-K Item
7    304(a)(1)(v), respectively.
8    From reading this statement, it seems old auditor K&C and new auditor KSP are two different com-
9    panies. But they were not. Both companies were controlled and managed by the same person:
10   Kabani.

11   **I.  Factual background of K&C 's relation with CGA.**

12   K&C, the replaced auditor, was located at 5757 W.Centry Blvd, Suite 303, Los Angeles, CA

13   90045, had been CGA's independent auditor between January 2008 and April 19, 2017 for 9 years.

14   During the period, K&C audited all the CGA's financial statement filed with SEC with their audit

15   reports year after year, even including some financial statements alleged as fraudulent in CGA'

16   big legal litigation between 2010 and 2014. K&C helped CGA finished Initial Public Offering

17   (IPO) and started and continued listing and trading on NYSE.  In return, As reward K&C got

18   handsome auditing fees year after year. Years of mutual collusion and tacit understanding had

19   made K&C and CGA formed inextricable interest relationship between each other. Especially after

20   CGA  recruited  Yiru Si, the former employee of K&C as Chairman of Audit Committee and Lead

21   Independent Director, their cooperation became more smooth. .

22   However, just less than one year after CGA passed the big class ligation with the $2.5 million

23   settlement in 2014, on January 22, 2015, K&C got a serious sanction from PCAOB. The sanction

24   is revoking K&C audit registration and Kabani himself's CPA license with $100,000 fine unless

25   they appealed.



January 22, 2015
Page 19

In light of the sanctions that we find appropriate to impose by summary affirmance, we find it unnecessary to consider, and we set aside the initial decision as it relates to, the other violations charged in the order instituting disciplinary proceedings.

Accordingly, it is ORDERED that:

The registration of Kabani & Company, Inc., is permanently revoked;

Hamid Kabani is permanently barred from being an associated person of a registered public accounting firm, and shall pay a civil money penalty of $100,000;

1   The
2   ground of the sanction is that they "intentionally and knowingly violated the PCAOB's rules"
3   when they "added or falsified hundreds of audit documents; intentionally reset internal computer
4   clocks to conceal that the alterations were made before applicable deadlines; and backdated their
5   signatures on relevant work papers" in an attempt to "conceal documentation deficiencies" in audit
6   files in advance of a PCAOB inspection. Acting "egregiously," in "deliberate disregard" of their
7   regulatory responsibilities.
8   Kabani appealed the sanction to SEC. Therefore the sanction was not effective immediately.  It
9   gave CGA and K&C a little more time to keep K&C as auditor and the same time to find a way to
10  keep their inextricable interest relationship and continue working together. They found a way
11  which is to start a new audit firm but under Kabani control.
12  **II.  The Scheme to make KSP is under Kabani's Control**
13  First step, KSP was registered on April 29, 2015, at the same office address with K&C and
14  installed his son Zeeshan Kabani, as registered agent. Refer below:

44

| ARTS-PC | Articles of Incorporation of a Professional Corporation |
|---|---|

3782644

To form a **professional corporation** in California, you can fill out this form or prepare your own document, and submit for filing along with:
— A **$100** filing fee.
— A separate, non-refundable **$15** service fee also must be included, if you **drop off** the completed form or document.

**FILED** Stamp
Secretary of State
State of California
APR 2 9 2015

*Important!* Corporations in California may have to pay a minimum $800 yearly tax to the California Franchise Tax Board. For more information, go to https://www.ftb.ca.gov.

Note: *Before* submitting the completed form, you should consult with a private attorney for advice about your specific business needs.

This Space For Office Use Only

**For questions about this form, go to** www.sos.ca.gov/business/be/filing-tips.htm.

**Corporate Name** (List the proposed corporate name. Contact the California state board or agency that controls your profession to find out if your profession is authorized to be a corporation in California and if there are any specific corporate name style rules. Go to www.sos.ca.gov/business/be/name-availability.htm for general corporate name requirements and restrictions.)
① The name of the corporation is  KSP Group, Inc.

**Corporate Purpose** (List the authorized profession.)
② The purpose of the corporation is to engage in the profession of _____ Accountancy _____ and any other lawful activities (other than the banking or trust company business) not prohibited to a corporation engaging in such profession by applicable laws and regulations. This corporation is a **professional corporation** within the meaning of California Corporations Code section 13400 et seq.

**Service of Process** (List a California resident or a California registered corporate agent that agrees to be your initial agent to accept service of process in case your corporation is sued. You may list any adult who lives in California. You may not list your own corporation as the agent. Do not list an address if the agent is a California registered corporate agent as the address for service of process is already on file.)
③ a.  Zeeshan Kabani
    *Agent's Name*
   b.  5757 West Century Blvd, Suite 303, Los Angeles,                          CA  90045
    *Agent's Street Address (if agent is **not** a corporation) - Do not list a P.O. Box*   City (no abbreviations)   State   Zip

**Corporate Addresses**
④ a.  5757 West Century Blvd,  Suite 303            Los Angeles          California          90045
    *Initial Street Address of Corporation - Do not list a P.O. Box*   City (no abbreviations)   State   Zip
   b.
    *Initial Mailing Address of Corporation, if different from 4a*   City (no abbreviations)   State   Zip

**Shares** (List the number of shares the corporation is authorized to issue. Note: Before shares of stock are sold or issued, the corporation must comply with the Corporate Securities Law of 1968 administered by the California Department of Business Oversight. For more information, go to www.dbo.ca.gov or call the California Department of Business Oversight at (866) 275-2677.)
⑤ This corporation is authorized to issue only one class of shares of stock.
   The total number of shares which this corporation is authorized to issue is  1,000

This form must be signed by each incorporator. If you need more space, attach extra pages that are 1-sided and on standard letter-sized paper (8 1/2" x 11"). All attachments are made part of these articles of incorporation.

▶ _____                LegalZoom.com, Inc. by Cheyenne Moseley, Assistant Secretary
   *Incorporator - Sign Here*                *Print your name here*

| Make check/money order payable to: Secretary of State | By Mail | Drop-Off |
|---|---|---|
| Upon filing, we will return one (1) uncertified copy of your filed document for free, and will certify the copy upon request and payment of a $5 certification fee. | Secretary of State Business Entities, P.O. Box 944260 Sacramento, CA 94244-2600 | Secretary of State 1500 11th Street, 3rd Floor Sacramento, CA 95814 |

Corporations Code §§ 200-202 et seq. and 13400 et seq., Revenue and Taxation Code § 23153.
ARTS-PC (REV 03/2014)                                                2014 California Secretary of State
                                                                    www.sos.ca.gov/business/be

1

Second step, in November 2015 KSP is registered with PCAOB and installed Prajakta Shetye as president. Prajakta Shetye was an employee working as Audit Manager at K&C from January, 2009 to November, 2017.

On March 10, 2017, SEC sustain the PCAOB's disciplinary action and K&C and Kabani's registration and license revoked permanently by PCAOB same day.

Third step, Immediately after the revoke, Kabani contacted Seller, the former employee of K&C, to let Sellers "take over the audit affairs of KSP" (which had been a shell company without any client listed in its filed annual report with PCAOB in 2016), so that Kabani could transfer K&C's existing clients to KSP. But the condition is sign a contract with his wife, Shahnaz, to legalize Kabani's control to KSP. Attracted by an attractive incentive of "20% gross revenues" of KSP. Seller accepted. After signing the contract on April 1, 2017, on April 3, 2017, the KSP's registration at California State was changed. The agent was changed from Zeeshan Kabani to Jaslyn Huynh. Then, on May 26, 2017, Kabani registered a new company, American Corporate

1   Learning Academy, naming Shahnaz Kabani as an agent. It is not coincident that all three related

2   companies, K&C, ACLA and KSP, shared the same address of 5757 W.Centry Blvd, Suite 303,

3   Los Angeles, CA 90045.



4

5   Defendant Sellers was a former employee of K&C between May 2006 and November 2015 as from

6   a receptionist to an Audit Manager. Based on Kabani;s own words,  It is Kabani who "mentored

7   Sellers and helped her study for and to eventually pass her CPA exams and personally signed her

8   license application with the Board of Accountancy in California." on May 1, 2008. However as an

9   Auditor Sellers seemed not qualified according Kabani's comment: "This was also despite compe-

10  tency issues and complaints from several clients about Defendant's work for them. In or around

11  November 2015, Defendant again resigned from Kabani & Co. and went to work for another ac-

12  counting firm." For such an unqualified auditor, why did Kabani bring her back to take over KSP,

1  his own newly registered audit firm? The answer is very clear: Sellers had a valid CPA license

2  which could be used for KSP legally doing audit business. Kabani confidently expected with the

3  well drafted contract between K&C and ACLC, He would be able to control his former employee

4  and mentee. As for auditing job, Kabani could still mentor, help and more importantly instruct her

5  to satisfy his clients

6  The contract is titled as "Accounting Services Agreement American Corporate Learning Academy

7  and KSP Group, Inc." Under the contract, Defendant Seller was Audit Director of KSP but

8  completely controlled by Kabani through ACLC and Shahnas,who is Kabani's wife and the joint

9  owner of K&C.

10  The whole scheme including the contract, was detailed by Kabani's wife, Shahnaz herself :

11   "As part and parcel of SELLERS' plan, SELLERS agreed to purchase all of the shares of
12   KSP from KABANI's son below value, and to enter into a contract with KABANI to
13   essentially run the business since SELLERS had no capabilities in this regard. SELLERS
14   had no prior experience of running an accounting firm which conducts the audit services
15   for public clients nor had any experience of procuring audits clients and negotiating fees
16   with them, on her own. The procurement of clients, negotiating the fees, issuing the
17   invoices, collecting fees from the clients, paying all the vendors, processing the payroll,
18   and disbursing salaries and draw amounts on a biweekly basis to SELLERS, were all
19   performed by KABANI (Shahnaz), through her Company, ACLA. **SELLERS' role was to
20   conduct the audits through the help of local staff (all of them hired by ACLA) as we ll
21   as through the help of foreign firms or foreign staff (introduced by ACLA) and issue
22   the reports**. KSP entered into a contract, dated April 1, 2017, with KABANI (Shahnaz)
23   note by Plaintiff ) (initially doing business as ACLA). The agreement, named "Accounting
24   Services Agreement American Corporate Learning Academy and KSP Group, Inc."
25   (hereafter,"Accounting Services Agreement"), provided that each year, KABANI would
26   ensure that the shareholder of KSP (i .e., SELLERS) " is provided with 20% of the total
27   amounts received in the bank account of KSP Group Inc." SELLERS specifically agreed
28   that ACLA would utilize the cash in the bank accounts of KSP to cover and pay all
29   appropriate expenses of KSP,….. SELLERS was fully aware of KABANI maintaining the
30   bank account, regularly communicated about deposit and payments and never asked to be
31   provided access to the KSP bank account. The agreement between SELLERS and ACLA
32   would ensure that ACLA would perform bookkeeping, accounting, payroll, administrative
33   management services, client procurement and retention, and bank and cash management
34   services " ECF 67-27 at 3,4.
35  As for ACLA, another signer of the contract, had been never existed and registered until May 26,

36  2017 and the entity are not only owned Kabani' wife Shahnaz but also Kabani himself. See the

1 registration form with hamid kabani's signature below:

 

Exhibit 2b

**California Secretary of State**
Electronic Filing

**FILED**
Secretary of State
State of California

### Corporation - Statement of Information No Change

| | |
|---|---|
| Entity Name: | AMERICAN CORPORATE LEARNING ACADEMY |
| Entity (File) Number: | C4030386 |
| File Date: | 03/18/2021 |
| Entity Type: | Corporation |
| Jurisdiction: | CALIFORNIA |
| Document ID: | GR75974 |

*There has been no change in any of the information contained in the previous complete Statement of Information filed with the California Secretary of State.*

By signing this document, I certify that the information is true and correct and that I am authorized by California law to sign.

Electronic Signature:    hamidkabani

*Use bizfile.sos.ca.gov for online filings, searches, business records, and resources.*

Document ID: GR75974

2

3 Based on the facts above, who is the real controller of KSP? The answer is Kabani, or through

4 Shahnaz or ACLC, not the nominal agent Sellers. Therefore, the conclusion is Kabani is an

5 ultimate controller all three companies, K&C, KSP and ACLA . KSP is just a surrogate of

6 Kabani's K&C.

7 **II. CGA knew the fact of KSP is under Kabani's control**.

8 **1) The scheme is designed and conducted jointly by Kabani and CGA**

9 In the background subsection of previous section. Plaintiff already asserted  Years of mutual

10 collusion and tacit understanding had made K&C and CGA formed inextricable interest

48

11 relationship between each other and keep the relationship is critical to CGA's continuation of fraud

1  business. The scheme to set up new company as a surrogate of Kabani's K&C is joint ideal of

2  CGA and Kabani. Without CGA's cooperation, the scheme would not performed.

3  **(2) CGA 's Chairman of Audit Committee is a former employee of K&C**

4  As alleged previously, the scheme is the joint designed and conducted by Kabani and CGA. As

5  for  CGA part, at top position every of  offier/director defendants played their individual role.

6  Among all the defendants, Yiru Shi played very critical role in the searching and selecting next

7  independent auditor . Pursqant to the rule 10A (m) (2)  of Exchange Act,

8  RESPONSIBILITIES RELATING TO REGISTERED PUBLIC AC COUNTING
9  FIRMS.—The audit committee of each issuer, in its capacity as a committee of the board
10 of directors, **shall be directly responsible for the appointment**, compensation, and
11 oversight of the work of any registered public accounting firm employed by that issuer
12 (including resolution of disagreements between management and the auditor regarding
13 financial re-porting) for the purpose of preparing or issuing an audit report or related work,
14 and each such registered public accounting firm shall report directly to the audit committee.
15 CGA also stated in their 10-Ks.

16  The Audit Committee is responsible for: (i) overseeing the corporate accounting and financial reporting
17 practices; (ii) *recommending the selection of our registered public accounting firm*; (iii) reviewing the ex-
18 tent of non-audit services to be performed by the auditors; and (iv) reviewing the disclosures made in our pe-
19 riodic financial reports..
20
21 Pursuant the above rules without her participation in the scheme, it is impossible for appointing

22 KSP as replacing auditor. During 2011-2017 Yiru Shi was a Director, later years also pointed as

23 lead Independent Director of Board , more importantly, Chairman of the Audit Committee

24 between 2012 and 2017. As disclosed by CGA in their 10-Ks "Yiru Shi  served as Audit Manager

25 at Kabani & Co. Inc. from 2005 to 2008" and Sellers the new independent auditor, KSP's only

26 licensed audit director and registered agent was also a former employees between May 2006 and

27 November 2015.  They were colleague each other in the same office for 4 yesrs between 2005 and

28 2008. They also both Chinese and women. They also lived close each other in the Orange county

29 and los Angeles area.

30  On April 18, 2017 Shi resigned as director of the board and Chairman of Audit Committee. The

31 auditor replacement happened on April 20, only 2 days later. The selection of new auditor should

32 be long process. Obviously; before Shi left she already finished her role in the scheme.

49

33 **(3) After KSP is selected as new auditor, the contact persons are same as with K&C.**

As admitted by Shahnaz:

> "KABANl to essentially run the business since SELLERS had no capabilities in this regard. SELLERS had no prior experience of running an accounting firm which conducts the audit services for public clients nor had any experience of procuring audits clients and negotiating fees with them, on her own. The procurement of clients, negotiating the fees, issuing the invoices, collecting fees from the clients, ……were all performed by KABANI (Shahnaz, noted by plaintiff ), through her Company, ACLA. **SELLERS' role was to conduct the audits through the help of local staff (all of them hired by ACLA) as we ll as through the help of foreign firms or foreign staff (introduced by ACLA) and issue the reports**."

Therefore, the communication between CGA and KSP related key items of auditing, audit fees, and payment and other auditing matters still between CGA and KSP is still with Kabani or his wife of the owner and managing principal on behalf of KSP. The nominal auditor and agent had no chance and right to contact CGA. Only thing sh**e was** authorized to do based on the contract is drafting the auditing documents with help of Kabani and after proved by Kabani, signed the audit reports.

## All THE CGA'S FALSE STATEMENTS ARE

## THE RESULT COLLECTIVE ACTS OF ALL THE DEFENDANTS

As forth above, Plaintiff has made total five allegations on CGA's false statements. However, a corporation, with helps of certified auditor, can act only through its employees and agents. All the officer/director defendants in the case jointly and individually played certain roles in preparing, drafting, reviewing, signing, decimating and filing the fraudulent statements:

The officer/director Defendants, because of their positions with CGA, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to investors. Each of the individual defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individ-

1   ual officer/director defendants knew that the adverse facts specified above had not been disclosed

2   to, and were being concealed from the public.

3   1.  Defendant Li, as the highest rank officer and Chairman of the Board, beside organizing directing

4   and coordinating the whole company to prepare and draft the fraudulent statement,  he signed all the

5   10-Qs and10-Ks since He was pointed as president in May 2016; issued all the press release with

6   his own comments quoted;  He hosted several quarterly and yearly conference calls to promote the

7   fraudulent 10-ks and 10-Qs. He also intentionally lied about Gufeng's operation status in person

8   when Plaintiff third time requested visiting Gufeng factory and refused Plaintiff's repeated visiting

9   requests. He specifically certified all the 10-Ks with certified the reports in form 302 and 906 re-

10  spectively since he became a chairman of board and CEO in 2017;For CGA's false statement alle-

11  gation, He should take the most important responsibility. See form 302 and 906 below:

EX-31.1 3 f10k2018ex31-1_chinagreen.htm CERTIFICATION

**Exhibit 31.1**

CERTIFICATION

I, Zhuoyu Li, certify that:

1.   I have reviewed this report on Form 10-K of China Green Agriculture, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

a)   all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting 51

Date: October 19, 2018

/s/ Zhuoyu Li

Zhuoyu Li
Chief Executive Officer

(principal executive officer)
the individual signed the reports. (listed them indivually)

EX-32.1 5 f10k2018ex32-1_chinagreen.htm CERTIFICATION

**Exhibit 32.1**

CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER
PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

The undersigned hereby certifies, in his capacity as the Chief Executive Officer of China Green Agriculture, Inc. (the "Company"), for the purposes of 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to the best of his knowledge:
 (1)  The Annual Report of the Company on Form 10-K for the fiscal year ended June 30, 2018 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
 (2)  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.
 Dated: October 19, 2018
 /s/ Zhuoyu Li

Zhuoyu Li
Chief Executive Officer
(principal executive officer)

2.  Defendant Yang as CFO, another principle executive, drafted, signed all the 10-Qs and 10ks and

certified all the 10-Ks on form 302 and 906 (same forms as Li certified, not copy them to save the

size of complaint) respectively since he was promoted to CFO in December 2017. He is directly re-

sponsible for drafting the fraudulent financial statement. Because he was CFO of Gufeng, all

Gufeng's fake data before 2017 also were out of his hands.

3. Defendant Zhu, As Chairman of Audit Committee and lead individual director. He is a signer of

three 10-Ks since he was appointed April 2017 and pursquant to the rule of SEC

RESPONSIBILITIES RELATING TO REGISTERED PUBLIC AC COUNTING FIRMS.—The audit committee of each issuer, in its capacity as a committee of the board of directors, shall be directly responsible for the appointment, compensation, and oversight of the work of any registered public accounting firm employed by that issuer (including resolution of disagreements between management and the auditor regarding financial re-porting) for the purpose of preparing or issuing an audit report or related work, and each such registered public accounting firm shall report directly to the audit committee.
CGA also stated in their 10-Ks.
 The Audit Committee is responsible for: (i) overseeing the corporate accounting and financial reporting practices; (ii) recommending the selection of our registered public accounting firm; (iii) reviewing the extent of non-audit services to be performed by the auditors; and (iv) reviewing the disclosures made in our periodic financial reports..

He is responsible all the falsity10-Qs and 10-Ks and fraudulent auditor reports since April, 2017

because knowingly not performing his duties above and as the lead director coordinating the coop-

eration between top executives and all the individual directors helped the fraudulent documents

produced and filed with SEC.

4. Defendant Shi, as Chairman of Audit Committee and Lead Independent director. She signed 10-K 2016 or oversee and reviewing all 10-Qs for fiscal year 2016 and three quarters 10-Qs 2017. She was responsible for those fraudulent financial documents the ground as same as Zhu. However, Shi was more serious.

1) Because She was working with her boss, Kabani for 4 years and very familiar K&C's background and fraudulent history. Shi has been watching her boss' audit activities. If she performed her duties under rules of SEC, she should make recommendation to replace the K&C long time ago. As the SEC defined Auditing Committee Financial Expert and US CPA license holder and all times the resident of Los Angeles, when Kabani initial revoke decision made with several years augments and investigations by PCAOB, She had known immediately. As a former Audit Manager of K&C, She must be very knowledgeable about how to watch her boss' audit work on CGA also how to track her boss' credentials on the website of PCAOB and Google. She must have known the big red-light of the initial sanction by PCAOB in 2015. However, with her intentionally helps, K&C continued another 2 years. According to the annual report filed by K&C. had twenty nine clients in 2010. After PCAOB started the investigation the case, most of its clients chose to replace K&C and the client number reduced from 29 to 8 in 2015 and 5 in 2016. The most serious act Shi took is she directly participated and played the critical role in the manipulative and deceptive scheme replacing K&C with KSP) as described in the Allegation 5.

Before resigning, She must have discussed with her former boss Kabani about Kabani's scheme to transfer the audit to KSP.

One of duties and qualifications as an Audit Committee Financial Expert, pursuant 407 of SEC Regulation S-K, is understanding and overseeing the issuer' internal control to produce the financial document. Shi has been resident of Los Angeles all times when she was in her position Chairman of Audit Committee of CGA. It is impossible for her to perform her duties.

53

**ALLEGATIONS TO AUDITOR DEFENDANTS**

1   From the above allegation, Plaintiff has alleged sufficient facts to plausibly implicate five critical

2   elements in CGA's  financial statement are fraudulent therefore we can confirm all the others data

3   are also wrong and misleading. However, without cover-up from Auditor Defendants those fraudu-

4   lent reports would  not be able to be filed with SEC.

5

6                    **BACKGROUND OF AUDITOR DEFENDENTS**

7   In  subsection "I.  Factual background of K&C 's relation with CGA" under the Allegation 5, Plain-

8   tiff  has already presented the background of Auditor Defendants including K&C, KSP, ALCA, and

9   individual defendants, Kabani, Shahnaz and Jaslyn, to save the size of the complaint, Plaintiff will

10  not repeat again. However, all the facts and arguments are applied here.

11

12              **ALLEGATION 1. AUDITOR DEFENDANTS ENGAGED**

13          **A MANIPULATIVE DECEPTIVE SCHEME TO CONCEAL THE TRUE**

14          **RELATION BETWEEN K&C AND KSP, BOTH CONTROLLED BY KABANI**.

15

16  In Allegation 5, Plaintiff also has plausibly proved K&C and KSP both were under Kabani's con-

17  trol, KSP is just a surrogate of K&C, replacement of K&C with KSP as a new auditor is a manipula-

18  tive and deceptive  scheme designed and conducted jointly by K&C and CGA. to save the size of

19  the complaint, Plaintiff will not repeat again. However, all the facts and arguments are also incorpo-

20  rated and applied here.

21  Therefore, KSP is still under the Kabani's control. Though all the audit reports signed by Seller,

22  Kabani is still the controller behind Seller. Therefore, Kabani is responsible all the fraudulent

23  statement in its audit reports.

24  By hiding true identy of KSP,  Kabani still was able to receive auditing fee by continuing to  certify

25  CGA's fraudulent financial statements. Meantime, PCAOB's sanction was partially bypassed and

54

26  Kabani again "harmed the market" and "pose a continuing danger to the investing public". Plaintiff

1    is one of  public investors seriously damaged by Auditor Defendants' fraudulent audit reports filed

2    with all CGA's fabricated financial reports together.

3

4                    ALLEGATION 2: ALL THE AUDIT REPORTS ISSUED

5                    WITH CGA's FINANCIAL STATEMENTS ARE FALSE

6     As registered public auditors, PCAOB clearly provided complete professional standard for every

7    auditor to follow. However, Auditor Defendants just did not follow the proper procedure with good

8    moral. Instead, They chose to help CGA and individual Defendants committing fraudulent scheme

9    to get Auditing income.

10   The auditor's responsibility is to express an opinion on the financial statements. The company's

11   transactions and the related assets, liabilities, and original records are within the control of man-

12   agement. The auditor's knowledge is limited to that acquired through the audit. Thus, it is under-

13   standable that it is not assured for an auditor to find all the frauds in the financial statement.

14   However, in the case, CGA and Individual  Defendants falsification of financial statements on such

15   a large scale and at every financial element,    If Auditor Defendants just reasonably followed the

16   standard of the PCAOB, they should be able easily find the falsities.

17   In the relevant period, K&C was responsible for monitoring three of 10-Qs and auditing and certify-

18   ing one 10-K fiscal year of 2016 and reviewing at least two of 10-Qs; KSP is responsible all the 10-

19   Qs and 10-Ks between April 2017 and June 2020. As mentioned above KSP totally controlled by

20   Kabani, Therefore Kabani is responsible all the fraudulent auditor reports in the relevant period with

21   KSP together.

22   I. **AUDITOR DEFENDANTS DID NOT FOLLOW THE STANDARDS OF THE PUBLIC**

23   **COMPANY ACCOUNTING OVERSIGHT BOARD.**

24   Below is the Audit Report by K&C certifying

25   **REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**
26   To the Board of Directors of
27   China Green Agriculture Inc. and its subsidiaries
28

We have audited the accompanying consolidated balance sheets of China Green Agriculture, Inc. and its sub-sidiaries (the "Company") as of June 30, 2016 and 2015, and the related consolidated statements of income and comprehensive income (loss), stockholders' equity, and cash flows for each of the years in the two-year period ended June 30, 2016. The Company's management is responsible for these financial statements. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assur-ance about whether the financial statements and schedules are free of material misstatement. An audit in-cludes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by manage-ment, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of China Green Agriculture, Inc. and its subsidiaries as of June 30, 2016 and 2015, and the results of its operations and its cash flows for each of the years in the two-year period ended June 30, 2016 in conform-ity with accounting principles generally accepted in the United States of America.

*/s/ KABANI & COMPANY, INC.*
CERTIFIED PUBLIC ACCOUNTANTS

Los Angeles, CA
October 6, 2016

For example, on the allegation 2 , plaintiff alleged huge difference between Gufeng's warehouse capacity and purported huge inventories. If any auditor just do a simple calculation, the huge de-fense can be found. Following is the standard of PCAOB:

### AS 2510: Auditing Inventories

.01     Observation of inventories is a generally accepted auditing procedure. The independent auditor who issues an opinion when he has not employed them must bear in mind that he has the burden of justifying the opinion expressed.

.09     When inventory quantities are determined solely by means of a physical count, and all counts are made as of the balance-sheet date or as of a single date within a reasonable time be-fore or after the balance-sheet date, it is ordinarily necessary for the independent auditor to be pre-sent at the time of count and, by suitable observation, tests, and inquiries, satisfy himself respect-ing the effectiveness of the methods of inventory-taking and the measure of reliance which may be placed upon the client's representations about the quantities and physical condition of the invento-ries.

.10     When the well-kept perpetual inventory records are checked by the client periodically by comparisons with physical counts, the auditor's observation procedures usually can be performed either during or after the end of the period under audit.

.11     In recent years, some companies have developed inventory controls or methods of deter-mining inventories, including statistical sampling, which are highly effective in determining inventory quantities and which are sufficiently reliable to make unnecessary an annual physical count of each item of inventory. In such circumstances, the independent auditor must satisfy himself that the cli-ent's procedures or methods are sufficiently reliable to produce results substantially the same as those which would be obtained by a count of all items each year. The auditor must be present to observe such counts as he deems necessary and must satisfy himself as to the effectiveness of the counting procedures used. If statistical sampling methods are used by the client in the taking of the physical inventory, the auditor must be satisfied that the sampling plan is reasonable and statis-tically valid, that it has been properly applied, and that the results are reasonable in the circum-stances.

.12     When the independent auditor has not satisfied himself as to inventories in the possession of the client through the procedures described in paragraphs .09 through .11, tests of the accounting records alone will not be sufficient for him to become satisfied as to quantities; it will always be necessary for the auditor to make, or observe, some physical counts of the inventory and apply appropriate tests of intervening transactions. This should be coupled with inspection of the records of any client's counts and procedures relating to the physical inventory on which the balance-sheet inventory is based.

.13     The independent auditor may be asked to audit financial statements covering the current period and one or more periods for which he had not observed or made some physical counts of prior inventories. He may, nevertheless, be able to become satisfied as to such prior inventories through appropriate procedures, such as tests of prior transactions, reviews of the records of prior counts, and the application of gross profit tests, provided that he has been able to become satisfied as to the current inventory.

Did K&C check the inventories quantity based on the above standard? No, even a very simple math

on the papers, they intentionally did not do it.

If they only by checking the tax payment record they can find immediately Gufeng did not pay any

EIT for years. Especially, the big class action mainly alleged CGA's Tax payment number complete

different from the records in the SAT.

If they just checked the related bank statement, they can find CGA did not have the purported cash

on hands It is true that they intentionally disregarded the standard of PCAOB. Their statement in the

audit reports completely fraudulent.  their audit is equivalent to they did not audit at all.

**II. AUDITOR DEFENDANTS IGNORED RED FLAG.**

The false financial statement and conbined false audit reports more and more raised concern about

several suspected elements in the 10-Ks and 10-Qs.

Several investors separately sent several emails to KSP between 2017 and 2019 to warn them the

serious and obviously risk of fraud. Below is Plaintiff sent:

From: gang chen <petechen@comcast.net>
To: jaslyn.huynh@kspgrp.com
Date: September 4, 2018 at 10:16 AM
Subject: verifying the cash balance of CGA
Dear Ms. Huynh:
As I know you and your firm is the paid auditor of CGA, China Green Agriculture. I would like to verify one of the most critical data on their quarterly and annually financial filing to SEC. Because recent months the company stock kept falling and not only $1.03 all time low. we do not understand why. the company kept filing the profit quarter by quarter, year by year but stock price kept falling same time. The most obvious reason for the phenomena is the shareholder lost their trust, suspecting all the financial data are fake.
But I still trust their financial filing because they hired you as their auditor which is a USA firm registered with SEC and knowing helping a company making a fake data is a serious crime. However, facing the current situation, even I raise a little concern on possibility of all data are fake.
I am looking forward to your prompt response.
Gang Chen, over 3% shareholder of CGA
5493 Antigua Circle, Vero Beach, FL 32967

57

phone/fax: 610-628-1021, Cell: 610-247-7515
Email: petechen@comcast.net

In the above email, Plaintiff warned KSP "helping a company making a fake data is *a serious crime*" and specifically targeted "verifying the *cash balance*" as a subject.  However, KSP just did not care. KSP did not respond any emails sent by several other investors and Plaintif himself. The 2018 annual report, KSP audited and signed  on Oct. 19, 2018, still show the cash and cash equivalent  $150,805, 639 which is highest in the relevant period. Below is the audit report on the annual report.

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM
To the Board of Directors of
China Green Agriculture, Inc. and its subsidiaries
We have audited the accompanying consolidated balance sheets of China Green Agriculture, Inc. and its subsidiaries (the "Company") as of June 30, 2018 and 2017, and the related consolidated statements of income and comprehensive income (loss), stockholders' equity, and cash flows for each of the years in the two-year period ended June 30, 2018. The Company's management is responsible for these financial statements. Our responsibility is to express an opinion on these financial statements based on our audits.
We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements and schedules are free of material misstatement. An audit includes *examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.* An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.
In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of China Green Agriculture, Inc. and its subsidiaries as of June 30, 2018 and 2017 and the results of its operations and its cash flows for each of the years in the two-year period ended June 30, 2018 in conformity with accounting principles generally accepted in the United States of America.
/s/ KSP Group, INC.
CERTIFIED PUBLIC ACCOUNTANTS

Los Angeles, CA October 19, 2018

6        KSP earned $370,000 audit fee for fiscal year 2018. However, did they reasonably perform the audit following the standard of PCAOB? At least, did they include "*examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements*"? As for K&C and Kabani, the permanent revoke had already implied their falsity. How about KSP? Did KSP learned from K&C and improved some? It is not.  PCAOB  issued a report on September 20,

7        for Inspection of KSP Group, Inc.

8        Certain deficiencies identified were of such significance that it appeared to the Inspection team

9        that the Firm, at the time it issued its audit report, had not obtained sufficient appropriate audit

10       evidence to support its opinion that the financial statements were presented fairly, in all materi-

11       al respects, in conformity with the applicable financial reporting framework. In

| 1 | | other words, in |
| 2 | 12 | these audits, the auditor issued an opinion |
| 3 4 | 13 | Without satisfying its fundamental obligation to obtain reasonable assurance about whether the |
| 5 | 14 | financial statements were free of material misstatement. |
| 6 7 | 15 | The fact that one or more deficiencies in an audit reach this level of significance does not nec- |
| 8 9 | 16 | essarily indicate that the financial statements are materially misstated. It is often not possible |
| 10 11 | 17 | for the inspection team, based only on the information available from the auditor, to reach a |
| 12 | 18 | conclusion on those points. |
| 13 14 | 19 | Whether or not associated with a disclosed financial reporting misstatement, an au-ditor's failure |
| 15 16 | 20 | to obtain the reasonable assurance that the auditor is required to obtain is a serious matter. It is |

1    a failure to accomplish the essential purpose of the audit, and it means that, based on the audit

2    work performed, the audit opinion should not have been issued.

3    The audit deficiencies that reached this level of significance are described below–

4    A.1. Issuer A

5    the Firm's failure to identify, or to address appropriately, a

6    departure from generally accepted accounting principles ("GAAP") that

7    appeared to the inspection team to be material, which related to the

8    presentation of cash flows in the issuer's financial statements (AS2810.30-.31); and

9    (2) the failure to perform sufficient procedures to test the allowance for

10    doubtful accounts ("AFDA") (AS 2301.11; AS 2501.11).

11

12    Among others, PCAOP inspection team clearly pointed "the Firm, at the time it

13    issued its audit report, had not obtained *sufficient appropriate audit evidence* to

14    support its opinion"

15    77 It is exactly the problem of KSP's audit.  The fake data in the CGA's reports so

16    obvious that Plaintiff , as an outsider, just applied common sense could identify

17    them. Auditor Defendants, as an official auditor, should access many internal rec-

18    ords and management are obligated to provide real records, otherwise, they will

19    be in jail by Chinese Criminal Law 162 (1) (2). Why did not Auditor Defendants

20    examine the evidence sufficiently? The most suspicious and critical data is cash

21    and cash reserves, which several investors specifically sent requested.
      Why Audi-

22    tor Defendants just did not seriously check the bank statement? It is so
      easy and

23    straight forward. Furthermore, the income tax data can be verified just
      simple

24    check the tax authorities notice and the payment record to the authority.
      Did Au-

1    1       ditor Defendants verified? The revenue are materialized by shipping
2                tonnage, Did
3

4    2       Auditor Defendants check it trucks in-out records kept at Gate guard?
5                Inventories
6

7    3       are also can be materialized into cubic meter or cubic foot, you know
8                the sizes of
9

10   4       Gufeng factory why did not you just do the simple calculation of ele-
11              mentary stu-
12

13   5       dents? Only one answer.  That is Auditor Defendants are cooperating
14              with CGA
15

16   6       and individual Defendants' fraud and got rewarded by audit fee.
17

| Audit Fees | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| Kabani | 370,000 | | | | |
| KSP | | 280,000 | 370,000 | 340,000 | 273,000 |

18   7

19
20
21    **III.  Sellers admitted KSP's audit is not compliant**

22    **with GAAS and Possible barred by PCAOB.**
23
24        "Calculated by SELLERS to occur prior to the 3 -year anniversary of KSP's last PCAOB inspection
25        to avoid a PCOAB review of SELLERS' audits and workpaper files , which SELLERS has
26        **admitted to several entities were not compliant with PCAOB standards (specifically with respect**
27        **to certain Chinese clients).** Indeed, SELLERS admitted to KABANI that she did not want to
28        undergo a PCAOB review for fear that she would become barred" ECF 67-27, at 6

29   From the above words out of Sellers's boss's month, Sellers herself knew how extremely departed

30   from the standard o PCAOB. She knew KSP's audit reports how serious. However, KSP or

31   Sellers and more seriously the controller of KSP did not corrected the obvious qualified (dirty)

32   audit reports knowingly let Audit reports kept harming vest American investors and Plaintiff is one

33   of them.

1

## SCIENTER ALLEGATIONS

### A. General Allegations Of Scienter

As described more fully above, the Individual Defendants were active, culpable,

and primary participants in the fraud by virtue of (1) their receipt of information reflecting the

true CGA's  operation status and  described herein and/or their failure to

review information they had a duty to monitor; (2) their actual issuance and control over CGA'

materially false and misleading statements; (3) their supervision over employees and actual

direction of policies that encouraged the fraud; and (4) their association with the Company which

made them privy to confidential information concerning the Company. The officer/diretor

Defendants knew or recklessly disregarded the materially false and misleading nature of the

information they caused to be disseminated to the investing public. The officer/diretor

Defendants also knew or recklessly disregarded that the Gufeng's idle status that caused Pfizer's

financial statements to be materially false and misleading would

adversely affect the integrity of the market for the Company's common stock and would cause the

price of the CGA's common stock to be artificially inflated. The officer/director Defendants acted

knowingly or in such a reckless manner as to constitute fraud and deceit upon Plaintiff.

As a result of having reviewed or having access to various true operation data and relations between

K&C and KSP, including  other concealed data and information alleged earlier

herein the officer/director Defendants engaged in a pattern of deceit by failing to disclose such ma-

terial adverse information.

The Defendants also manipulated the true relation between K&C and KSP including the relations

between two former employees and colleagues of K&C which was certain to have a material ad-

verse effect on the coming years qualified or unqualified audit report which Plaintiff relied on to

judge the financial statements received from CGA. Hiding a true relation between replaced and re-

1   placing auditor is a manipulative and deceptive scheme jointly designed and conducted by all the

2   officer/director Defendants and auditor defendants.

3   Accordingly, the Defendants engaged in issuing fraudulent statements and conducting a manipula-

4   tive scheme to defraud and engaged in a practice that operated as a fraud on Plaintiff.

5   The Defendants' scienter is evidenced by the intentional concealment of the truth related Plaintiff's

6   five allegations.

7   **B. The Individual Defendants have opportunities to commit the Fraud.**

8   **I. Officer/Auditor Defendant Were In Positions Of Actual Control And/Or**

9   **Supervision Of Making Fraudulent Statement.**

10   The officer/Director Defendants directed, knew about fraudulent practices of fraudulent statement

11   and manipulative scheme which implemented under their watch. As officers and dirctors of CGA,

12   officer/Director Defendants Li, Yang, Zhu and Shi each knew, through direct knowledge through

13   the control nature of their positions material adverse information. Therefore, they all have opportu-

14   nities to committed the Fraud

15   **II. Auditor Defendant as engaged independent Auditor has opportunities to issue the false**

16   **statements in audit report**

17   C. **All the defendants have Strong motive to commit the fraud**

18   **I. Officer/Director Defendants's Motives.**

19   1. CGA's compensation  plan and bonus based on the gross revenue and net income. By making

20   fraudulent financial statement, all the Officer/Director Defendants can received more money.

21   2. As stated in the allegation 3, by making fraudulent income and value-added tax, they have oppor-

22   tunities to embezzle the amount to personal use same time avoiling US corporate income tax

23   3. By fabricating fraudulent huge inventories, they have opportunities to write off the asset of the

24   company and convert the value of the huge inventories to their own coffers.

25

**II. Auditor Defendants' Motive.**

they can get huge auditor fees for example, K&C received  total of $3,111,500 for 9 years auditing

between 2008 and 2017 .

KSP received total amount of $1,263,000  in conducting the manipulative and deceptive scheme

through the manipulative scheme of concealing the real identities and relationship with CGA and

K&C.

**C. Strong circumstantial evidence of conscious misbehavior or recklessness.**

The Fraudulent statements and the audit reports are extremely departed from the truth and reasona-

ble care of standard of PCAOB and GSSP raised strong inference: all the defendants making falsi-

fied Financial statement and audit reports with Scienter.

As alleged in Allegation 1, The number or count of Gufeng's revenues tonnages of shipment, the

count of working employeed, inventories and income and value-added extremely inflated basically

out of nothing.

<strong>LOSS CAUSATION</strong>

During the relevant period, as detailed herein, Defendants engaged in making fraudulent statement

and concealing real identify schemes to deceive the market and a course of conduct that artificially

inflated the prices of CGA's securities and operated as a fraud or deceit on relevant period  purchas-

ers of CGA's  securities by failing to disclose to investors that the Company's financial results were

materially misleading and misrepresented material information. When Defendants' misrepresenta-

tions and fraudulent conduct were disclosed and became apparent to the market, the prices of CGA's

securities fell. And the value of Plaintiff holding fell with market price together. During the relevant

period, Plaintiff suffered realized economic loss of approximate $1.25 million.

By failing to disclose the true state of the CGA's finances and accounting, investors were not aware

of the true state of the Company's financial status. Therefore, Plaintiff suffered seriously damages

by the false financial statement

1    The first CGA financial statements Plaintiff ever read is CGA Annual report, Form 10-k, for fiscal

2    year ended June 30 2016 filed 2016-10-17 and first quarter report of 2017, Form 10-q, for the quar-

3    ter ended September 30, 2016 filed 2016-11-14. Therefore, time span of this action started from fis-

4    cal year 2016 and ended at June 2020 when Plaintiff filed the original complaint.

5    According to the 2017 first quarter report, CGA has cash and cash equivalents $108, 121,059, total

6    asset $412,443,256, total liability $84,444,713; net sales $61,884,622, net income $7,351,580. CGA

7    has totaled 3137384 (37648605 12/1 split) outstanding shares, stock market price $17.40 at that

8    time. Therefore the stock has price/book 0.14, price/earning 1.88, price/sale 0.2 and each share has

9    cash $34. The stock seems so attractive to an ordinary private investor, likePlaintiff.

10   Since then, Plaintiff has read total 11 of quarterly reports of 10Q and 3 of Annual reports (2017,

11   2018, and 2019) of 10K filed by CGA. Most of  reports with similar attractive financial data as their

12   the 2017 first quarter report .

13   For example, in the last annual report for fiscal year ended June 30, 2019, it stated: cash and cash

14   equivalents $72,259,804, total asset $480,000,359, total liability $35,669,918; net sales

15   $294,320,803, net income $11,590,395.

16   Another example, in the last quarter report for quarterly period ended March 31, 2020, it stated,

17   cash and cash equivalents $41,311,137, total asset $395,274,720, total liability $ 79,682,492; net

18   sales $85,826,689, net loss $50,222,309. Here CGA suddenly reported a huge loss.

19   Basically, most of CGA's quarterly and annually are very attractive to me while the stock price had

20   kept falling. Therefore, Plaintiff became skeptical. To verify the truth Plaintiff made two special

21   trips to China.

22   Plaintiff started purchase of CGA stock from middle of December 2016, purely attracted by CGA's

23   quarterly and annually reports filed with SEC.  Plaintiff's holding volume grew rapidly from begin-

24   ning zero, added to over $1.5 million of shares in middle of 2018 when Plaintiff was attending CGA

25   annual meeting. During the annual meeting, Plaintiff harshly criticized Defendants on the issue that

1    having  huge cash reserve but not distributing any dividend  to shareholders; only rewarding man-

2    agement themselves generously with huge bonus, telling Defendants the company is not manage-

3    ment's ATM machine for themselves. Defendants showed  me other 2 factories in Xi'an, then Plain-

4    tiff still believed Defendants financial statements and their cover-up and rosy stories. Plaintiff was

5    fooled by Defendants and even sent positive comments to all other CGA investors of my communi-

6    cation group.  Even though Plaintiff only saw total 2 trucks when he visited twice and viewing from

7    outside during my first special trip to China.  I was fooled by Defendant Li's story about Gufeng is

8    in maintenance in the time. So Plaintiff still did not reduce the investment with CGA and keep the

9    position level even if when the stock price started dropping. But finally Plaintiff became suspicious

10   therefore went to China in second trip in February 2019 and visited Gufeng again in March  then

11   found the truth.  After Plaintiff confirmed that all CGA's financial statement were false, Plaintiff

12   gradually reduced the holding. After CGA's last annual report came out October 15, 2019, Plaintiff

13   decided to expedite unloading CGA stock. Plaintiff only had about $7500 with 3000 shares before

14   Plaintiff filed the action  in June 2019.  By trading CGA stock, Plaintiff suffered damages over

15   $1.25 million as a result of the violations of the federal securities laws alleged herein.

16   Because their deceptive financial statements and suspicious business behaviors, American invest-

17   ment public completely lost their trust to CGA and the stock price had kept dropping from $19.20,

18   the highest close price of the relevant period, in first week of January, 2018 to the lowest $1.84 on

19   March 9, 2020; it was trading around $2.60 at first week of June 2020 when Plaintiff initiated the

20   legal action. Plaintiff is seriously economically damaged

21

22   COUNT I.  FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE

23   10b-5(b) PROMULGATED THEREUNDER) AGAINST ALL DEFENDANTS

1    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs of

2    this Complaint as if fully set forth herein

3    During the relevant Period, the Defendants: (a) deceived the investing public,

4    including Plaintiffs, as alleged herein; (b) artificially inflated and maintained the market prices of

5    The Defendants made untrue statements of material fact and/or omitted to state

6    material facts necessary to make the statements made not misleading, and/or substantially

7    participated in the creation of the alleged misrepresentations, which operated as a fraud and deceit

8    upon Plaintiffs, in an effort to maintain artificially high market prices for CGA common stock in

9    violation of Section 10(b) of the Exchange Act and Rule 10b-5(b). The Defendants consistently

10    made materially false and misleading statements and omitted to state material facts regarding the

11    CGA and specifically Gufeng operation status and financial data during the Period, thus materially

12    misrepresenting CGA's real condition.

13    As a result of their making and/or their substantial participation in the creation of

14    affirmative statements and reports to the investing public, the Defendants had a duty to promptly

15    disseminate truthful information that would be material to investors in compliance with the

16    SEC regulations, including accurate and truthful information with

17    respect to the Company's operations and performance so that the market prices of the Company's

18    common stock would be based on truthful, complete and accurate information.The Defendants

19    consistently failed to perform this duty.

20    The Defendants, directly and indirectly, by use of the means and instrumentalities

21    of interstate commerce and/or the mails, made, or substantially participated in the creation of,

22    untrue statements of material facts and/or omitted to state material facts necessary in order to

23    make the statements made about the Company in light of the circumstances under which they were

24    made, not misleading, as set forth herein.

25    The Defendants had actual knowledge of the misrepresentations and/or omissions

1   of material fact set forth herein, or acted with reckless disregard for the truth in that they failed to

2   ascertain and to disclose such facts, even though such facts were available to them.

3   The facts alleged herein give rise to a strong inference that each of the Defendants

4   acted with scienter. The Defendants' own internal information concerning CGA's operation per-

5   formance.

6    At the time of said misrepresentations and omissions, Plaintiffs were ignorant of

7   their falsity, and believed the false statements to be true. Had Plaintiffs the truth, Plaintiffs would

8   not have purchased CGA common stock at all or, would not have done so at the artificially inflat-

9   ed prices that they paid.

10  The Defendants' materially false and misleading statements and omissions of

11  material fact caused Plaintiffs to suffer losses in connection with their investments in CGA

12  common stock. CGA stock price collapsed as the truth was revealed over time

13  By reason of the foregoing, the Defendants violated Section 10(b) of the

14  Exchange Act and Rule 10b-5(b) promulgated thereunder, and are liable to Plaintiffs for damages

15  suffered in connection with purchases of CGA common stock during the Period. (a) To employ any

16  device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit

17  to state a material fact necessary in order to make the statements made, in the light of the circum-

18  stances under which they were made, not misleading, or (c) To engage in any act, practice, or

19  course of business which operates or would operate as a fraud or deceit upon any person, in connec-

20  tion with the purchase or sale of any security."

21  .Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentali-

22  ties of interstate commerce and/or of the mails, engaged and participated in a continuous course of

23  conduct to conceal adverse material information about the Company's financial well-being, opera-

24  tions, and prospects. During the relevant period, Defendants made the false statements specified

25  above, which they knew or recklessly disregarded to be false and misleading in that they contained

1    misrepresentations and failed to disclose material facts necessary in order to make the statements

2    made, in light of the circumstances under which they were made, not misleading.  Defendants had

3    actual knowledge of the misrepresentations and omissions of material fact set forth herein, or reck-

4    lessly disregarded the true facts that were available to them. Defendants engaged in this misconduct

5    to conceal CGA true condition from the investing public and to support the artificially inflated pric-

6    es of the Company's common stock. Plaintiff has suffered damages in that, in reliance on the integ-

7    rity of the market, they paid artificially inflated prices for CGA common stock. Plaintiff would not

8    have purchased the Company's common stock at the prices they paid, or at all, had they been aware

9    that the market prices for CGA's common stock had been artificially inflated by Defendants' fraud-

10   ulent course of conduct. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff

11   suffered damages in connection with their respective purchases of the Company's common stock

12   during the relevant Period. By virtue of the foregoing, Defendants violated Section 10(b) of the Ex-

13   change Act and Rule 10b-5, promulgated there under.

14

15   COUNT II.  FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE

16   10b-5(a) (c) PROMULGATED THEREUNDER) AGAINST ALL DEFENDANTS

17   Plaintiff repeats, and incorporates each and every allegation above as if fully set forth herein. As set

18   forth herein, During the relevant period,  CGA, K&C, KSP and ACLA and all individual defendants

19   including Officer/Diredtor Defendants and Auditor individual defendants jointly designed and con-

20   ducted a scheme of concealing the real identies of KSP to make KSP as a unrelated party to K&C

21   and CGA so that Kabani was able to by passing the sanction of PCAOB and continuing the auditing

22   business with CGA  to make money and CGA was able to continue to keep Kabani to help CGA's

23   fraudulent business by deceiving the US investors to buy CGA stock at inflated price. By commit-

24   ting such a fraud, all defendants violated SECTION 10(b) OF THE EXCHANGE ACT AND Spher-

25   ically RULE 10b-5(a) (c) PROMULGATED THEREUNDER) (a) To employ any device, scheme,

1    or artifice to defraud or (c) To engage in any act, practice, or course of business which operates or

2    would operate as a fraud or deceit upon any person, in connection with the purchase or sale of

3    any security." By believing the false information on the relation of CGA, K&C, KSP, Plaintiff be-

4    lieve KSP is really totally new  and totally independent auditor and mistrusted its audit reports and

5    relied on KSP's audit report incorporated with CGA's financial statement, especially three of annu-

6    al reports and CGA's audited annual reports to buy and keep  a big quantity of CGA's common

7    stock and suffered huge losses.

8    **COUNT III. FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT**

9    **AGAINST THE INDIVIDUAL DEFENDANTS**

10    Plaintiff repeats, and incorporates each and every allegation above as if fully set forth herein. As set

11    forth herein, the Individual Defendants, by virtue of their receipt of  information reflecting the true

12    facts regarding CGA, their control over, receipt and/or modification of CGA's allegedly materially

13    misleading statements and omissions, and/or their positions with the Company which made them

14    privy to confidential information concerning CGA, participated in the fraudulent scheme alleged

15    herein. The ongoing fraudulent

16    scheme described herein could not have been perpetrated over a substantial period of time, as has

17    occurred, without the knowledge and complicity of the personnel at the highest level of the Compa-

18    ny, including the Individual Defendants.

19    During the relevant period, the Individual Defendants, as senior executive officers of the company

20    were privy to confidential, proprietary and material adverse non-public information  concerning

21    CGA, its operations, finances, financial condition and present and future business prospects via ac-

22    cess to internal corporate documents, conversations and connections with other corporate officers

23    and employees, attendance at management and/or board of directors meetings and committees

24    thereof, and via reports and other information provided to them in connection therewith. Because of

25    their possession of such information, the Individual the Individual Defendants are liable as direct

1     participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason

2     of their status as senior executive officers and/or directors, were "controlling persons" within the

3     meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to

4     engage in the unlawful conduct complained of herein. Because of their positions of control, the In-

5     dividual Defendants were able to and did, directly or indirectly, control the conduct of CGA's busi-

6     ness.

7     The Individual Defendants, because of their positions with the Company, controlled and/or pos-

8     sessed the authority to control the contents of its reports, press releases and

9     presentations to securities analysts and, through such analysts, to the investing public. The Individ-

10     ual Defendants were provided with copies of the Company's reports and publicly disseminated doc-

11     uments alleged herein to be misleading, prior to or shortly after their issuance and had the ability

12     and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual De-

13     fendants had the opportunity to commit the fraudulent acts alleged herein.

14     As senior executive officers and/or directors and as controlling persons of a publicly traded compa-

15     ny whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were

16     traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a

17     duty to promptly disseminate accurate and truthful information with respect to CGA's financial con-

18     dition and performance, growth, operations, financial statements, business, products, markets, man-

19     agement, earnings, and present and future business prospects, to correct any previously issued

20     statements that had become materially misleading or untrue, so the market price of China Green's

21     securities would be based on truthful and accurate information. The Individual Defendants' misrep-

22     resentations and omissions during the relevant period violated these specific requirements and obli-

23     gations.The Individual Defendants are liable as participants in a fraudulent scheme and course of

24     business that operated as a fraud or deceit on purchasers of CGA's publicly traded securities by dis-

25     seminating materially false and misleading statements and/or concealing material adverse facts.

1   PRAYER FOR RELIEF

2   WHEREFORE, Plaintiff prays for judgment as follows:

3   Awarding compensatory damages in favor of Plaintiff against all Defendants, jointly and severally,

4   for the damages of $1.25 million realized as a result of Defendants' fraud;

5   Awarding punitive damages of $500,000 or more for defendants' serious frauds, if permitted by

6   law. The amount of fraud penalty is comparable to the amount of civil remedies administrative pro-

7   ceedings  by law may charge considering defendant committed Third Tier violation specified by

8   SEC. 21B(b)(3) of Exchange ACT.

9   Awarding pre-judgment interest, as well as reasonable attorneys' fees and the  Plaintiff's costs for

10  taking this action, as permitted by law; and

11  Awarding such other and further relief as this Court may deem just and proper.

12

13  JURY DEMAND

14  Plaintiff demands a trial by jury.

15

16  Dated: Oct 29, 202 1                          Respectfully submitted,

17  Gang Chen   *gang chen*

18  5493 Antigua Circle

19  Vero Beach, FL 32967

20  Telephone: (610)247-7515

21